# NEW YORK STATE DEPARTMENT OF SOCIAL SERVICES ET AL. *v.* DUBLINO ET AL.

No. 72–792.   Argued April 17–18, 1973—Decided June 21, 1973*

---

*Together with No. 72–802, *Onondaga County Department of Social Services et al.* v. *Dublino et al.*, also on appeal from the same court.

406

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and DOUGLAS, STEWART, WHITE, BLACKMUN, and REHNQUIST, JJ., joined. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 423.

*Jean M. Coon*, Assistant Solicitor General of New York, argued the cause for appellants in both cases. With her on the briefs in No. 72–792 were *Louis J. Lefkowitz*, Attorney General, and *Ruth Kessler Toch*, Solicitor General. *Philip C. Pinsky* filed a brief for appellants in No. 72–802.

*Dennis R. Yeager* argued the cause and filed briefs for appellees in both cases.†

MR. JUSTICE POWELL delivered the opinion of the Court.

The question before us is whether the Social Security Act of 1935, 49 Stat. 620, as amended, bars a State from

---

†Briefs of *amici curiae* urging reversal in both cases were filed by *Solicitor General Griswold, Wilmot R. Hastings,* and *St. John Barrett* for the United States, and by *Evelle J. Younger,* Attorney General, *Elizabeth Palmer,* Assistant Attorney General, and *John J. Klee, Jr.,* Deputy Attorney General, for the State of California.

*Steven J. Cole* and *Henry A. Freedman* filed a brief for the National Welfare Rights Organization et al. as *amici curiae* urging affirmance in both cases.

independently requiring individuals to accept employment as a condition for receipt of federally funded aid to families with dependent children.  More precisely, the issue is whether that part of the Social Security Act known as the Federal Work Incentive Program (WIN) preempts the provisions of the New York Social Welfare Law commonly referred to as the New York Work Rules.  A brief description of both the state and federal programs will be necessary.

The Work Rules were enacted by New York in 1971 [1]

---

[1] The basic provisions of the Work Rules at the time this action was brought are set forth in § 131 of the New York Social Services Law (Supp. 1971–1972):

"4. No assistance or care shall be given to an employable person who has not registered with the nearest local employment agency of the department of labor or has refused to accept employment in which he is able to engage.

"A person shall be deemed to have refused to accept such employment if he:

"a. fails to obtain and file with the social services district at least semi-monthly a new certificate from the appropriate local employment office of the state department of labor stating that such employment office has no order for an opening in part-time, full-time, temporary or permanent employment in which the applicant is able to engage, or

"b. willfully fails to report for an interview at an employment office with respect to employment when requested to do so by such office, or

"c. willfully fails to report to such office the result of a referral to employment, or

"d. willfully fails to report for employment.  Such willful failures or refusals as above listed shall be reported immediately to the social services district by such employment office.

"For the purposes of this subdivision and subdivision five, a person shall be deemed employable if such person is not rendered unable to work by: illness or significant and substantial incapacitation, either mental or physical, to the extent and of such duration that such illness or incapacitation prevents such person from performing services; advanced age; full-time attendance at school in the case of minor, in accordance with provisions of this chapter; full-time, satisfactory participation in an approved program of voca-

as part of Governor Rockefeller's efforts to reorganize the New York Welfare Program. Their aim, as explained by the Governor, is to encourage "the young and able-bodied, temporarily in need of assistance through no fault of their own, to achieve the education and the skills, the motivation and the determination that will make it possible for them to become increasingly self-sufficient, independent citizens who can contribute to and share in the responsibility for their families and our society." [2]

To achieve this, the Work Rules establish a presumption that certain recipients of public assistance are employable [3] and require those recipients to report every two weeks to pick up their assistance checks in person; to file every two weeks a certificate from the appropriate public employment office stating that no suitable employment opportunities are available; to report for

---

tional training or rehabilitation; the need of such person to provide full-time care for other members of such person's household who are wholly incapacitated, or who are children, and for whom required care is not otherwise reasonably available, notwithstanding diligent efforts by such person and the appropriate social services department to obtain others to provide such care. A person assigned to and participating in a public works project under the provisions of section one hundred sixty-four or three hundred fifty-k of this chapter shall be deemed to be employable but not employed.

"Every employable recipient of public assistance or person who is deemed not to be employable by reason of full-time satisfactory participation in an approved program of vocational training or rehabilitation shall receive his public assistance grants and allowances in person from the division of employment of the state department of labor, in accordance with regulations of the department."

Section 350-k of New York Social Services Law provides for public works project employment for employable recipients of AFDC who cannot be placed in regular employment.

[2] Special Message to the New York State Legislature, Mar. 29, 1971 (Brief for Appellant N. Y. State Depts. 9).

[3] For the statutory definition of persons deemed "employable" see n. 1, *supra*.

requested employment interviews; to report to the public employment office the result of a referral for employment; and not to fail willfully to report for suitable employment, when available. In addition to establishing a system of referral for employment in the private sector of the economy, the Work Rules permit the establishment of public works projects in New York's social service districts.[4] Failure of "employable" persons to participate in the operation of the Work Rules results in a loss of assistance.[5]

Like the Work Rules, WIN is designed to help individuals on welfare "acquire a sense of dignity, self-worth, and confidence which will flow from being recognized as a wage-earning member of society . . . ," 42 U. S. C. § 630 (1970 ed., Supp. I). The program was enacted as part of the 1967 amendments to the Social Security Act,[6] whereby States were required to incorporate WIN into their Aid to Families With Dependent Children (AFDC)

---

[4] See *ibid.* These provisions for employment of recipients in public works projects have not been implemented, as the HEW Regional Commissioner indicated that such projects would not be approved for federal aid. Brief for Appellant N. Y. State Depts. 13.

[5] See n. 1, *supra,* and Social Services Administrative Letter, 71 PWD–43 which reads in relevant part:

"[T]he Laws of 1971 place a renewed and expanded emphasis on restoring all employable recipients of public assistance to employment in the regular economy. Accordingly, all unemployed employable persons applying for or receiving public assistance are not only required to register at the New York State Employment Service district office in their community, and report there regularly for appropriate employment counseling services and job referral, but, effective July 1, they will also pick up their assistance checks there. The penalty for not cooperating in this procedure is ineligibility for public assistance whether the individual is the grantee head of family, single person living alone, or non-grantee non-head of family." App. 53–54.

[6] In 1971, further amendments dealing with WIN were enacted. Act of Dec. 28, 1971, Pub. L. 92–223, § 3, 85 Stat. 803.

plans. 42 U. S. C. §§ 602 (a) (19), 630 *et seq.* (1970 ed. and Supp. I). Every state AFDC plan must provide that certain "employable" individuals, as a condition for receiving aid, shall register for manpower services, training, and employment under regulations promulgated by the Secretary of Labor. 42 U. S. C. § 602 (a) (19) (A) (1970 ed., Supp. I).[7] Available services, to be provided by the State, must include "such health, vocational rehabilitation, counseling, child care, and other social and supportive services as are necessary to enable such individuals to accept employment or receive manpower training . . . ." 42 U. S. C. § 602 (a) (19) (G) (1970 ed.,

---

[7] "§ 602. State plans for aid and services to needy families with children; contents; approval by Secretary.

"(a) A State plan for aid and services to needy families with children must . . .

.                .                   .                    .                     .

"(19) provide—

"(A) that every individual, as a condition of eligibility for aid under this part, shall register for manpower services, training, and employment as provided by regulations of the Secretary of Labor, unless such individual is—

"(i) a child who is under age 16 or attending school full time;

"(ii) a person who is ill, incapacitated, or of advanced age;

"(iii) a person so remote from a work incentive project that his effective participation is precluded;

"(iv) a person whose presence in the home is required because of illness or incapacity of another member of the household;

"(v) a mother or other relative of a child under the age of six who is caring for the child; or

"(vi) the mother or other female caretaker of a child, if the father or another adult male relative is in the home and not excluded by clause (i), (ii), (iii), or (iv) of this subparagraph (unless he has failed to register as required by this subparagraph, or has been found by the Secretary of Labor under section 633 (g) of this title to have refused without good cause to participate under a work incentive program or accept employment as described in subparagraph (F) of this paragraph)."

Supp. I). After the required services have been provided, the State must certify to the Secretary of Labor those individuals who are ready for employment or training programs, 42 U. S. C. §§ 602 (a) (19) (G), 632, 633 (1970 ed. and Supp. I).[8] Employment consists both of work in the regular economy and participation in public service programs. 42 U. S. C. §§ 630, 632, 633 (1970 ed. and Supp. I). As with the Work Rules, cooperation in WIN is necessary for employable individuals to continue to receive assistance.

In the court below, appellees, New York public assistance recipients subject to the Work Rules, challenged those Rules as violative of several provisions of the Constitution and as having been pre-empted by the WIN provisions of the Federal Social Security Act. The three-judge District Court rejected all but the last contention. 348 F. Supp. 290 (WDNY 1972). On this point, it held that "for those in the AFDC program, WIN pre-empts"[9] the New York Work Rules. *Id.*, at 297.[10] As

---

[8] States are penalized by a reduction in assistance if they fail to certify to the Secretary of Labor at least 15% of the average number of those registered each year. 42 U. S. C. § 603 (c) (1970 ed., Supp. I).

[9] The District Court and the parties in this case have used the word "pre-emption" in a rather special sense. This litigation does not involve arguable federal pre-emption of a wholly independent state program dealing with the same or a similar problem. Cf., *e. g., Huron Portland Cement Co.* v. *Detroit*, 362 U. S. 440, 446 (1960). AFDC is a federal statutory program, of which the WIN program is a part. The State Work Rules also were promulgated as part of the implementation of AFDC, and are therefore not wholly independent of the federal program. With this caveat, however, we will preserve the District Court's usage, which has the advantage of focusing attention on the critical question: whether Congress intended WIN to provide the exclusive mechanism for establishing work rules under AFDC.

[10] The court found additional points of conflict between the state and federal programs with regard to procedures for termination of

this holding not only affected the continued operation of the New York Rules but raised serious doubts as to the viability of the supplementary work programs in 22 States, we set the cause for argument, 409 U. S. 1123 (1973).[11] We now reverse this holding.

## I

The holding of the court below affects the Work Rules only insofar as they apply to AFDC recipients. 348 F. Supp., at 297, 300 and n. 5. New York's Home Relief program, for example—a general state assistance plan for which there is no federal reimbursement or support[12]—remains untouched by the court's pre-emption ruling. As to AFDC participants, however, the decision below would render the Work Rules inoperative and hold WIN "the exclusive manner of applying the carrot and stick" in efforts to place such recipients in gainful employment. *Id.,* at 300.[13]

---

benefits and the presence of certain hearings and counseling services under WIN which were absent from the Work Rules. 348 F. Supp. 290, 295–297.

[11] We postponed consideration of the question of jurisdiction to the hearing on the merits. We now conclude that the constitutional questions raised by appellees were not so insubstantial as to deprive the three-judge District Court of jurisdiction.

As to appellees' due process claim, the court below directed the State to implement suitable means of informing Home Relief recipients of their hearing rights. *Id.,* at 299. The State stipulates that this has been done. Tr. of Oral Arg. 19–20. The only issue which we address on this appeal is whether the state program is superseded in whole or in part by federal law.

[12] The AFDC program is jointly financed by the States and the Federal Government. *Dandridge* v. *Williams,* 397 U. S. 471, 473 (1970).

[13] Appellees' position is also one of "complete exclusion" of the Work Rules, at least with regard to AFDC recipients. Tr. of Oral Arg. 34; Brief for Appellees in Response to Brief for the United States as *Amicus Curiae* 2–3.

This is a sweeping step that strikes at the core of state prerogative under the AFDC program—a program which this Court has been careful to describe as a "scheme of cooperative federalism." *King* v. *Smith,* 392 U. S. 309, 316 (1968); *Dandridge* v. *Williams,* 397 U. S. 471, 478 (1970); *Jefferson* v. *Hackney,* 406 U. S. 535, 542 (1972). It could impair the capacity of the state government to deal effectively with the critical problem of mounting welfare costs and the increasing financial dependency of many of its citizens. New York has a legitimate interest in encouraging those of its citizens who can work to do so, and thus contribute to the societal well-being in addition to their personal and family support. To the extent that the Work Rules embody New York's attempt to promote self-reliance and civic responsibility, to assure that limited state welfare funds be spent on behalf of those genuinely incapacitated and most in need, and to cope with the fiscal hardships enveloping many state and local governments, this Court should not lightly interfere. The problems confronting our society in these areas are severe, and state governments, in cooperation with the Federal Government, must be allowed considerable latitude in attempting their resolution.

This Court has repeatedly refused to void state statutory programs, absent congressional intent to pre-empt them.

> "If Congress is authorized to act in a field, it should manifest its intention clearly. It will not be presumed that a federal statute was intended to supersede the exercise of the power of the state unless there is a clear manifestation of intention to do so. The exercise of federal supremacy is not lightly to be presumed." *Schwartz* v. *Texas,* 344 U. S. 199, 202–203 (1952).

See also *Engineers* v. *Chicago, R. I. & P. R. Co.*, 382 U. S. 423, 429 (1966); *Huron Portland Cement Co.* v. *City of Detroit*, 362 U. S. 440, 446 (1960); *Mintz* v. *Baldwin*, 289 U. S. 346, 350 (1933); *Savage* v. *Jones*, 225 U. S. 501, 533 (1912).

This same principle relates directly to state AFDC programs, where the Court already has acknowledged that States "have considerable latitude in allocating their AFDC resources, since each State is free to set its own standard of need and to determine the level of benefits by the amount of funds it devotes to the program." *King* v. *Smith, supra,* at 318–319; *Dandridge* v. *Williams, supra,* at 478; *Jefferson* v. *Hackney, supra,* at 541. Moreover, at the time of the passage of WIN in 1967, 21 States already had initiated welfare work requirements as a condition of AFDC eligibility.[14] If Congress had intended to pre-empt state plans and efforts in such an important dimension of the AFDC program as employment referrals for those on assistance, such intentions would in all likelihood have been expressed in direct and unambiguous language. No such expression exists, however, either in the federal statute or in the committee reports.[15]

Appellees argue, nonetheless, that Congress intended to pre-empt state work programs because of the comprehensive nature of the WIN legislation, its legislative his-

---

[14] See Brief for the United States as *Amicus Curiae* 12. The information was derived from a survey of state plans conducted by the Department of Health, Education, and Welfare.

[15] No express intention to eliminate co-existing state work programs appears either at the time of the original 1967 enactment of WIN, see S. Rep. No. 744, 90th Cong., 1st Sess., 26, 145–157; H. R. Rep. No. 1030, 90th Cong., 1st Sess., 58–59, or at the time of the 1971 amendments, n. 6, *supra.*

tory,[16] and the alleged conflicts between certain sections of the state and federal laws.[17]   We do not agree.   We reject, to begin with, the contention that pre-emption is to be inferred merely from the comprehensive character of the federal work incentive provisions, 42 U. S. C. §§ 602 (a)(19), 630 *et seq.* (1970 ed. and Supp. I).   The subjects of modern social and regulatory legislation often by their very nature require intricate and complex responses from the Congress, but without Congress necessarily intending its enactment as the exclusive means of meeting the problem, cf. *Askew* v. *American Waterways,* 411 U. S. 325 (1973).   Given the complexity of the matter addressed by Congress in WIN, a detailed statutory scheme was both likely and appropriate, completely apart from any questions of pre-emptive intent.   This would be especially the case when the federal work incentive provisions had to be sufficiently comprehensive to authorize and govern programs in States which had no welfare work requirements of their own as well as cooperatively in States with such requirements.

Appellees also rely, as did the District Court, on the legislative history as supporting the view that "the WIN legislation is addressed to all AFDC recipients, leaving no employable recipients to be subject to state work rules."   Brief for Appellees 29.   The court below pointed to no specific legislative history as supportive of its conclusion.   Appellees do cite fragmentary statements

---

[16] The court below asserted that the legislative history was supportive of a pre-emptive intent, 348 F. Supp., at 297.

[17] In view of our remand, Part III, *infra,* we do not reach the issue of specific alleged conflicts.   In sum, however, they are not sufficient to indicate pre-emptive intent, especially in light of the impressive evidence to the contrary.

which we find unpersuasive. Reliance is placed, for example, on a statement in the Report of the House Ways and Means Committee on the WIN legislation as follows:

> "Under your committee's bill, States would be required to develop a program *for each appropriate* relative and dependent child which would assure, to the maximum extent possible, that each individual would enter the labor force *in order to become self-sufficient.* To accomplish this, the States would have to assure that *each* adult in the family and each child over age 16 who is not attending school is given, when appropriate, employment counseling, testing, and job training." H. R. Rep. No. 544, 90th Cong., 1st Sess., 16 (1967).[18] (Emphasis supplied.)

At best, this statement is ambiguous as to a possible congressional intention to supersede all state work programs.[19] "Appropriateness," as used in the Committee

---

[18] Other citations to similar effect appear in Brief for Appellees 29–30.

[19] Perhaps the most revealing legislative expressions confirm, subsequent to enactment, a congressional desire to preserve supplementary state work programs, not to supersede them. In the wake of the invalidation of the New York Work Rules by the three-judge District Court, members of the New York congressional delegation became concerned that the court had misconstrued the intent of Congress. The following colloquy occurred between Senator Buckley of New York and Senator Long of Louisiana, Chairman of the Finance Committee which considered WIN prior to approval by the Senate:

"Mr. Buckley. Was it ever the intention of Congress at that time to have the provisions of the WIN statutes preempt the field of employment and training for ADC recipients?

"Mr. Long. I did not have that in mind. . . .

"Mr. Buckley. . . . So far as the distinguished chairman is con-

Report, may well mean "appropriateness" solely within the scope and confines of WIN. Furthermore, the language employed by Congress in enacting WIN must be considered in conjunction with its operational scope and level of funding, which, as will be shown, is quite limited with respect to the total number of employable AFDC recipients, Part II, *infra.*

In sum, our attention has been directed to no relevant argument which supports, except in the most peripheral way, the view that Congress intended, either expressly or impliedly, to pre-empt state work programs. Far more would be required to show the "clear manifestation of [congressional] intention" which must exist before a federal statute is held "to supersede the exercise" of state action. *Schwartz* v. *Texas,* 344 U. S., at 202–203.

---

cerned, was it ever the intention of at least this body to have a preemption in this field?

. "Mr. Long. It was never our intention to prevent a State from requiring recipients to do something for their money if they were employable. . . ." 118 Cong. Rec. 36819 (1972).

In the House of Representatives, a similar dialogue took place between Congressman Carey of New York and Congressman Mills, Chairman of the House Ways and Means Committee, which considered the WIN program:

"Mr. Carey of New York. . . . My specific question for the chairman has to do with the intent of the Congress in authorizing the WIN program in 1967 and in amendments to that program in subsequent years. It is my understanding that Congress intended, through the WIN program, merely to assist the States in the critical area of guiding able-bodied welfare recipients toward self-sufficiency—and not to supersede individual State programs designed to achieve the same end. Under this interpretation, New York and other States could operate their own programs as supplementary to the Federal WIN program. Is my understanding of the congressional intent in this area correct?

"Mr. Mills of Arkansas. I agree with the interpretation of my friend, the gentleman from New York, on the matter, so long as the State program does not contravene the provisions of Federal law." 118 Cong. Rec. 36931 (1972).

## II

Persuasive affirmative reasons exist in this case which also strongly negate the view that Congress intended, by the enactment of the WIN legislation, to terminate all existing state work programs and foreclose additional state cooperative programs in the future. We note, first, that WIN itself was not designed on its face to be all embracing. Federal work incentive programs were to be established only in States and political subdivisions

> "in which [the Secretary of Labor] determines there is a significant number of individuals who have attained age 16 and are receiving aid to families with dependent children. In other political subdivisions, he shall use his best efforts to provide such programs either within such subdivisions or through the provision of transportation for such persons to political subdivisions of the State in which such programs are established." 42 U. S. C. § 632 (a) (1970 ed., Supp. I).

This section constitutes an express recognition that the federal statute probably would be limited in scope and application.[20] In New York, this has meant operation of WIN in only 14 of New York's 64 social service districts, though these 14 districts do service approximately 90% of the welfare recipients in the State. Yet the Secretary of Labor has not authorized additional WIN programs for the other districts, resulting in a lack of federal job placement opportunities in the more lightly populated areas of States and in those without adequate

---

[20] The WIN guidelines, issued by the United States Department of Labor, provide, according to appellants, for establishment of WIN programs only in those areas where there are at least 1,100 potential WIN enrollees. Brief for Appellant N. Y. State Depts. 37.

transportation of potential enrollees to districts with WIN programs.[21]

Even in the districts where WIN does operate, its reach is limited. In New York, according to federal estimates, there are 150,000 WIN registrants for the current fiscal year, but the Secretary of Labor has contracted with the State to provide services to only 90,000 registrants, of whom the majority will not receive full job training and placement assistance.[22] In fiscal 1971, New York asserts that "17,511 individuals were referred for participation in the WIN Program, but the Federal government allowed only 9,600 opportunities for enrollment." [23] California claims "over 122,000 employable AFDC recipients" last year, but only 18,000 available WIN slots.[24]

It is evident that WIN is a partial program which stops short of providing adequate job and training opportunities for large numbers of state AFDC recipients. It would be incongruous for Congress on the one hand to promote work opportunities for AFDC recipients and on the other to prevent States from undertaking supplementary efforts toward this very same end. We cannot

---

[21] See *id.*, at 37–38. Title 42 U. S. C. § 602 (a) (19) (A) (iii) (1970 ed., Supp. I) may also have contemplated limited application of WIN, since it exempts from WIN registration "a person so remote from a work incentive project that his effective participation is precluded."

[22] See Brief for the United States as *Amicus Curiae* 15, citing U. S. Dept. of Labor, Manpower Administration, contract No. 36–2–0001–188, modification No. 3, June 30, 1972. The Government contends further that "the current level of WIN funding is such that no more than one-fifth of the WIN registrants will receive the full job training and placement assistance contemplated by the Act." *Ibid.*

[23] Brief for Appellant N. Y. State Depts. 38, 17.

[24] Brief for California as *Amicus Curiae* 3.

interpret federal statutes to negate their own stated purposes. The significance of state supplementation is illustrated by the experience in New York, where the Work Rules have aided the objectives of federal work incentives: from July 1 through September 30, 1971, the first months of the Work Rules' operation, the State Employment Service claimed job placements for approximately 9,376 recipients.[25]

Moreover, the Department of Health, Education, and Welfare, the agency of Government responsible for administering the Federal Social Security Act—including reviewing of state AFDC programs—has never considered the WIN legislation to be pre-emptive. HEW has followed consistently the policy of approving state plans containing welfare work requirements so long as those requirements are not arbitrary or unreasonable.[26] Congress presumably knew of this settled administrative policy at the time of enactment of WIN, when 21 States had welfare work programs. Subsequent to WIN's passage, HEW has continued to approve state work requirements. Pursuant to such approval, New York has re-

---

[25] Brief for Appellant N. Y. State Depts. 15; App. 192. Appellants claim further that from January to June 1972, "there were 2,657 job placements under the WIN Program," and 5,323 placements under the Work Rules. *Id.*, at 18. These figures must be qualified, however, with the observation that many of the job placements are temporary; that many of those placed under the Work Rules may have been recipients of forms of assistance other than AFDC (while the number of WIN placements counts only AFDC recipients); and that single recipients may have been referred or placed—and thus statistically tabulated—on more than one occasion. See Brief for Appellees 33–36. None of these observations, however, obscures the basic fact that the Work Rules materially contribute toward attainment of the objective of WIN in restoring employable AFDC recipients as wage-earning members of society. See 42 U. S. C. § 630 (1970 ed., Supp. I).

[26] See Brief for the United States as *Amicus Curiae* 3, filed by the Solicitor General and joined in by the General Counsel of HEW.

ceived federal grants-in-aid for the operation of its AFDC plan, including its work provisions.[27]   In interpreting this statute, we must be mindful that "the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong . . . ." *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367, 381 (1969); *Dandridge* v. *Williams*, 397 U. S., at 481–482.   In this case, such indications are wholly absent.

New York, furthermore, has attempted to operate the Work Rules in such a manner as to avoid friction and overlap with WIN.   Officials from both the State Department of Labor and a local Social Service Department testified below that every AFDC recipient appropriate for WIN was first referred there, that no person was to be referred to the state program who was participating in WIN, and that only if there was no position available for him under WIN, was a recipient to be referred for employment pursuant to state statute.[28]   Where coordinate state and federal efforts exist within a complementary administrative framework, and in the pursuit of common purposes, the case for federal pre-emption becomes a less persuasive one.

In this context, the dissenting opinion's reliance on *Townsend* v. *Swank*, 404 U. S. 282 (1971), *Carleson* v. *Remillard*, 406 U. S. 598 (1972), and *King* v. *Smith*, 392 U. S. 309 (1968), is misplaced.   In those cases it was clear that state law excluded people from AFDC benefits who the Social Security Act expressly provided would be eligible.   The Court found no room either in the Act's

---

[27] *Ibid.*

[28] Excerpts from depositions of Nelson Hopper, Director of the Employment Service Bureau of the New York State Dept. of Labor, and George Demmon, Senior Employment Counsellor, Erie County Dept. of Social Services, App. 226, 234.   See also Brief for Appellant N. Y. State Depts. 17, and Tr. of Oral Arg. 7.

language or legislative history to warrant the States' additional eligibility requirements. Here, by contrast, the Act allows for complementary state work incentive programs and procedures incident thereto—even if they become conditions for continued assistance. Such programs and procedures are not necessarily invalid, any more than other supplementary regulations promulgated within the legitimate sphere of state administration. See *Wyman* v. *James*, 400 U. S. 309 (1971); *Snell* v. *Wyman*, 281 F. Supp. 853 (SDNY), aff'd, 393 U. S. 323 (1969). See also *Dandridge* v. *Williams, supra; Jefferson* v. *Hackney*, 406 U. S. 535 (1972).

## III

We thus reverse the holding below that WIN preempts the New York Work Rules. Our ruling establishes the validity of a state work program as one means of helping AFDC recipients return to gainful employment. We do not resolve, however, the question of whether some particular sections of the Work Rules might contravene the specific provisions of the Federal Social Security Act.

This last question we remand to the court below. That court did not have the opportunity to consider the issue of specific conflict between the state and federal programs, free from its misapprehension that the Work Rules had been entirely pre-empted. Further, the New York Legislature amended the Work Rules in 1972 to provide, among other things, for exemption of persons engaged in full-time training and vocational rehabilitation programs from the reporting and check pickup requirements (N. Y. Laws 1972, c. 683), for monthly rather than semi-monthly payments of shelter allowances (*id.*, c. 685) and, most significantly, for a definition of an "employable" AFDC recipient which is claimed by New York to be identical to that now used

under WIN (*id.*, c. 941). Inasmuch as the court below did not have the opportunity to consider the 1972 amendments as they related to the issue of potential state-federal conflict, the remand should afford it.

We deem it unnecessary at the present time to intimate any view on whether or to what extent particular provisions of the Work Rules may contravene the purposes or provisions of WIN. Such a determination should be made initially by the court below, consistent with the principles set forth in this opinion.[29]

The judgment of the three-judge District Court is reversed and the cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN joins, dissenting.

Because the Court today ignores a fundamental rule for interpreting the Social Security Act, I must respectfully dissent. As we said in *Townsend* v. *Swank,* 404 U. S. 282, 286 (1971), "in the absence of congressional authorization for the exclusion clearly evidenced from the Social Security Act or its legislative history, a state

---

[29] In considering the question of possible conflict between the state and federal work programs, the court below will take into account our prior decisions. Congress "has given the States broad discretion," as to the AFDC program, *Jefferson* v. *Hackney,* 406 U. S. 535, 545 (1972); see also *Dandridge* v. *Williams,* 397 U. S., at 478; *King* v. *Smith,* 392 U. S. 309, 318–319 (1968), and "[s]o long as the State's actions are not in violation of any specific provision of the Constitution or the Social Security Act," the courts may not void them. *Jefferson, supra,* at 541. Conflicts, to merit judicial rather than cooperative federal-state resolution, should be of substance and not merely trivial or insubstantial. But if there is a conflict of substance as to eligibility provisions, the federal law of course must control. *King* v. *Smith, supra; Townsend* v. *Swank,* 404 U. S. 282 (1971); *Carleson* v. *Remillard,* 406 U. S. 598 (1972).

eligibility standard that excludes persons eligible for assistance under federal AFDC standards violates the Social Security Act and is therefore invalid under the Supremacy Clause." See also *King* v. *Smith,* 392 U. S. 309 (1968); *Carleson* v. *Remillard,* 406 U. S. 598, 600 (1972). The New York Work Rules fall squarely within this statement; they clearly exclude persons eligible for assistance under federal standards, and it could hardly be maintained that they did not impose additional conditions of eligibility.[1] For example, under federal standards, it is irrelevant to a determination of eligibility that a recipient has or has not filed every two weeks a certificate from the local employment office that no suitable employment opportunities are available, yet under the Work Rules, a recipient who fails to file such a certificate is "deemed" to have refused to accept suitable employment, and so is not eligible for assistance. N. Y. Soc. Serv. Law § 131 (4)(a) (Supp. 1971–1972).[2] Thus, according to the rules of interpretation we have heretofore followed, the proper inquiry is whether the Social Security Act or its legislative history clearly shows congressional authorization for state employment requirements other than those involved in WIN.[3]

---

[1] Appellants state that the Work Rules do not "constitute an additional condition of eligibility for public assistance." Reply Brief for Appellant N. Y. State Depts. 9. The arguments they present, however, relate entirely to the purported congressional authorization for additional conditions of this sort.

[2] The federal conditions of eligibility relating to registration for employment are found in 42 U. S. C. § 602 (a)(19) (1970 ed., Supp. I).

[3] The United States, as *amicus curiae,* argues that the rule stated in *Townsend* v. *Swank,* 404 U. S. 282 (1971), does not fairly characterize the course of our interpretation of the Social Security Act. It relies primarily on the Court's decision in *Wyman* v. *James,*

The answer is that neither the Act nor its legislative history shows such an authorization. The only relevant work-related conditions of eligibility in the Act are found at 42 U. S. C. § 602 (a)(19) (1970 ed., Supp. I). In addition to exempting certain persons from registration for and participation in WIN,[4] the Act permits States to

---

400 U. S. 309 (1971). But, for reasons that escaped me at the time, see *id.*, at 345 n. 7, the Court did not address the statutory argument. *Wyman* does not, therefore, express any limitation on the rule in *Townsend.* Similarly, our summary affirmance in *Snell* v. *Wyman,* 393 U. S. 323 (1969), where the District Court did not have before it our opinion in *King* v. *Smith,* 392 U. S. 309 (1968), is at least offset by the summary affirmances in *Carleson* v. *Taylor,* 404 U. S. 980 (1971), *Juras* v. *Meyers,* 404 U. S. 803 (1971), and *Weaver* v. *Doe,* 404 U. S. 987 (1971).

The United States' argument from authority is weak, and its argument as a matter of logic is even weaker. The United States suggests that, while States may not narrow the class of persons eligible for assistance under federal standards, they may impose additional conditions of eligibility in pursuit of independent state policies. This distinction will not withstand analysis, for it makes decision turn on meaningless verbal tricks. One could just as easily find an independent state policy in *Townsend* as a narrowing of the class of eligible persons: the State might have a policy of minimizing subsidies to persons with a clear prospect of future income well above the poverty level, by denying assistance to persons attending four-year colleges while granting it to those attending vocational training schools. Such a system of subsidies would almost certainly be held constitutional under the Due Process Clause, and the position of the United States seems to be that States may impose conditions of eligibility, not squarely in conflict with federal standards, in the pursuit of some constitutional state interest.

[4] For example, no child under 16 or attending school full time need register. 42 U. S. C. § 602 (a)(19)(A)(i) (1970 ed., Supp. I). I take it that the Court would find a conflict "of substance," *ante,* at 423 n. 29, between this provision and a state work requirement applicable to children under 16. For the legislative history is clear that Congress, in defining the work-related conditions of eligibility, "spell[ed] out those people we think should not be required to go to

disregard the needs of persons otherwise eligible for assistance who "have refused without good cause to participate under a work incentive program . . . or . . . to accept employment in which he is able to engage." 42 U. S. C. § 602 (a)(19)(F) (1970 ed., Supp. I). The Act thus makes *actual* refusal to participate in a WIN Program or to accept employment a permissible ground for denying assistance. In contrast, New York has adopted the none-too-subtle technique of "deeming" persons not to have accepted employment because they have not, for example, obtained a certain certificate from the local employment office every two weeks. "Deeming" is a familiar legal device to evade applicable requirements by saying that they have been satisfied when they have not in fact been satisfied. But the federal requirement, which the State may not alter without clear congressional authorization,[5] requires an actual refusal to participate in a WIN Program or to accept employment, not a refusal to participate in some other program or a fictitious refusal of employment.[6]

The legislative history of the Social Security Act confirms this interpretation, for whenever Congress legislated

work," as Senator Long put it. 113 Cong. Rec. 32593 (1967). See also S. Rep. No. 744, 90th Cong., 1st Sess., 26. The United States' position would be, I assume, that such a provision would narrow the class of persons eligible for assistance.

[5] Appellants argue that "the provision of section 602 (a)(10) that aid be furnished 'to all eligible individuals' when read within the context of the Social Security Act means individuals 'eligible' under State requirements, not Federal." Reply Brief for Appellant N. Y. State Depts. 13. We expressly rejected this argument in *Townsend,* 404 U. S., at 286.

[6] The States may, of course, adopt procedures necessary to insure that offers of employment are transmitted to recipients of public assistance. It hardly needs extended argument, however, to show that the New York Work Rules, taken as a whole, are not necessary to do that.

with respect to work requirements, it focused on actual refusals to accept employment or to participate in certain special programs clearly authorized by Congress. At no time has Congress authorized States to adopt other work-referral programs or to make refusal to participate in such programs a condition of eligibility, even under the guise of "deeming" such a refusal a refusal to accept employment.

At its inception, the program of Aid to Dependent Children was designed to lessen somewhat the burden of supporting such children. The program provided assistance to children who had been deprived of parental support by reason of the absence of a parent. 49 Stat. 629 (1935). Assistance was provided to supply the needs of such children, thus "releas[ing the parent] from the wage-earning role." H. R. Doc. No. 81, 74th Cong., 1st Sess., 30 (1935). See also H. R. Rep. No. 615, 74th Cong., 1st Sess., 10 (1935). Thus, the program's purposes were in many ways inconsistent with a requirement that the parent leave the home to accept employment. Yet, in operation, the original program failed to provide sufficient inducement for the parent to remain at home, since the amount of assistance was measured solely by the child's needs. In order further to relieve the pressures on the parent to leave the home and accept work, Congress amended the Act in 1950 so that the aid would include payments "to meet the needs of the relative with whom any dependent child is living." 42 U. S. C. § 606 (b)(1).

Until 1961, then, the sole emphasis of the Social Security Act's provisions for assistance to dependent children was on preserving the integrity of the family unit.[7]

---

[7] In 1956, Congress required States to adopt plans to provide social services to strengthen family life. Pub. L. 880, § 312, 70 Stat. 848.

In that year, Congress expanded the definition of dependent child to include children deprived of parental support by reason of the unemployment of a parent.  42 U. S. C. § 607.  Families with two parents present could, for the first time, receive assistance, and one parent could leave the home to work without impairing the integrity of the family unit.  Congress therefore required States participating in the program for aid to families with an unemployed parent to deny assistance under this provision to individuals who refused to accept bona fide offers of employment.  Pub. L. 87–31, 75 Stat. 76 (1961). Refusal of actual offers of employment was clearly the contemplated condition. See S. Rep. No. 165, 87th Cong., 1st Sess., 3 (1961).  Congress then developed this concept, permitting States to establish "Community Work and Training Programs" of work on public projects, Pub. L. 87–543, § 105, 76 Stat. 186, rendered inapplicable by Pub. L. 90–248, 81 Stat. 892.  Refusal to accept a work assignment on such a project without good cause would be a ground for denial of public assistance. See H. R. Rep. No. 1414, 87th Cong., 2d Sess., 15 (1962).

When Congress established WIN, it did not abandon its previous policies.  Recipients of public assistance could be required only to accept bona fide offers of employment or placement in specified programs.  There is no indication whatsoever in the legislative history that Congress intended to permit States to deny assistance because potential recipients had refused to participate in programs not supervised by the Secretary of Labor, as WIN Programs are.  The parameters of the WIN Program were designed to accommodate Congress' dual interests in guaranteeing the integrity of the family and in maximizing the potential for employment of recipients of public assistance.  Without careful federal supervision, of the sort contemplated by the delegation to

the Secretary of Labor to establish testing and counseling services and to require that States design employability plans, 81 Stat. 885, state work programs might upset the accommodation that Congress sought. The Work Incentive Program was thus a carefully coordinated system, whose individual parts fit into an integrated whole. It is hardly surprising that Congress did not expressly or impliedly authorize States to develop independent work programs, since the WIN Program represented Congress' recognition that such programs had to be kept under careful scrutiny if the variety of goals Congress sought to promote were to be achieved.[8] I believe that the Court seriously misconceives the purposes of the federal programs of public assistance, in its apparent belief that Congress had the sole purpose of promoting work opportunities, a purpose that precluding additional state programs would negate. *Ante,* at 418–420.

---

[8] The original proposal for a Work Incentive Program would have permitted a State to operate Community Work and Training Programs only if a federal WIN Program were not operated in the State. H. R. 5710, 90th Cong., 1st Sess., § 204 (a). Thus, either a WIN Program or a state program could operate within a State, but not both. In the final version, the pre-existing authorization for Community Work and Training Programs was eliminated, and the Federal WIN Program was to be implemented in every State. Again, Congress recognized that federal and state work programs could not coexist.

The 1971 Amendments to the WIN Program, Pub. L. 92–223, 85 Stat. 802, further demonstrate Congress' desire to have federal control of work requirements. Each State must establish a "separate administrative unit" to provide social services only in connection with WIN. 42 U. S. C. § 602 (a) (19) (G) (1970 ed., Supp. I). It would be anomalous for Congress to require the States to devote substantial resources to such a unit in connection with the WIN Program, and yet to permit the States to operate independent work programs using federal funds without providing the special services that Congress thought so important.

Instead, Congress has consistently indicated its desire to adopt programs that will enhance the employability of recipients of public assistance while maintaining the integrity of families receiving assistance. A work-referral program can do this only if it is regulated, both as to the persons required to participate and as to the terms on which they must participate. And Congress has consistently recognized that such regulation requires close federal supervision of work programs. In my view, this course of legislation, which is not mentioned by the Court, is neither "ambiguous," "fragmentary," nor "peripheral," *ante,* at 415, 416, 417. No matter how it is viewed, however, one cannot fairly say that the Social Security Act or its legislative history clearly evidences congressional authorization for making participation in state work programs a condition of eligibility for public assistance.[9]

---

[9] It is unnecessary for me to discuss at any length the Court's analysis of the pre-emption problem. I note, as the Court does, *ante,* at 411 n. 9, that this case does not present the classic question of pre-emption, that is, does the enactment of a statute by Congress preclude state attempts to regulate the same subject? There is no question that New York may impose whatever work requirements it wishes, consistent only with constitutional limitations, when it gives public assistance solely from state funds. See *ante,* at 412. The question here relates to the conditions that Congress has placed on state programs supported by federal funds. The distinction is not without importance, for it makes inapposite the strictures in our earlier cases and relied on by the Court, against lightly interfering with state programs. *Ante,* at 413–414. For we must, of course, be cautious when we prevent a State from regulating in an area where, in the absence of congressional action, it has important interests. Holding that the Federal WIN Program is the exclusive method of imposing work requirements in conjunction with federally funded programs of public assistance would have no such impact; New York would remain free to operate public assistance programs with state funds, with whatever work requirements it chose.

The policy of clear statement [10] in *Townsend* serves a useful purpose. It informs legislators that, if they wish to alter the accommodations previously arrived at in an Act of major importance, they must indicate clearly that wish, since what may appear to be minor changes of narrow scope may in fact have ramifications throughout the administration of the Act. A policy of clear statement insures that Congress will consider those ramifications,[11] but only if it is regularly adhered to.

Finally, it is particularly appropriate to require clear statement of authorization to impose additional conditions of eligibility for public assistance. Myths abound in this area. It is widely yet erroneously believed, for

[10] See H. Hart & A. Sacks, The Legal Process 1240 (tent. ed. 1958).

[11] In this connection, I cannot let pass without comment the extraordinary use the Court makes of legislative "history," in relying on exchanges on the floor of the House and Senate that occurred *after* the decision by the District Court in this case. *Ante*, at 416–417, n. 19. Although reliance on floor exchanges has been criticized in this Court, *Schwegmann Bros.* v. *Calvert Distillers Corp.*, 341 U. S. 384, 395–397 (1951) (Jackson, J., concurring), there is some force to the more generally accepted proposition that such exchanges, particularly when sponsors of a bill or committee chairmen are involved, are relevant to a determination of the purpose Congress sought to achieve in enacting the bill. *United States* v. *St. Paul, M. & M. R. Co.*, 247 U. S. 310, 318 (1918). For legislators know how legislative history is made, and they ought to be aware of the importance of floor exchanges. If they disagree with the interpretation placed on the bill in such exchanges, they may offer amendments or vote against it. Thus, Congress, in enacting a statute, may fairly be taken to have endorsed the interpretations offered in such exchanges. None of this is true of post-enactment floor exchanges, which have no bearing on pending legislation and to which a disinterested legislator might well pay scant attention. If Senator Buckley and Representative Carey wished to have a congressional expression of intent on the issue of pre-emption, they were not barred from introducing legislation.

example, that recipients of public assistance have little desire to become self-supporting. See, *e. g.*, L. Goodwin, Do the Poor Want to Work? 5, 51–52, 112 (1972). Because the recipients of public assistance generally lack substantial political influence, state legislators may find it expedient to accede to pressures generated by misconceptions. In order to lessen the possibility that erroneous beliefs will lead state legislators to single out politically unpopular recipients of assistance for harsh treatment, Congress must clearly authorize States to impose conditions of eligibility different from the federal standards. As we observed in *King* v. *Smith,* 392 U. S., at 318–319, this rule leaves the States with "considerable latitude in allocating their AFDC resources, since each State is free to set its own standard of need and to determine the level of benefits by the amount of funds it devotes to the program." The Court today quotes this observation but misses its import. The States have latitude to adjust benefits in the two ways mentioned, but not by imposing additional conditions of eligibility. When across-the-board adjustments like those are made, legislators cannot single out especially unpopular groups for discriminatory treatment.[12]

For these reasons, I would affirm the judgment of the District Court.

---

[12] That the possibility of treatment that is so discriminatory as to be unconstitutional is not insubstantial is shown by the Court's brief discussion of the jurisdiction of the District Court, *ante,* at 412 n. 11.