## AUTOMATED MEDICAL LABORATO-RIES, INC., Plaintiff-Appellant,

v.

## HILLSBOROUGH COUNTY, Florida, and Hillsborough County Health Department, Defendants-Appellees.

### No. 83–3014.

United States Court of Appeals, Eleventh Circuit.

Jan. 16, 1984.

Larry A. Stumpf, Miami, Fla., for plaintiff-appellant.

Richard Landfield, Washington, D.C., for amicus Blood Resources Assoc. & FL Assoc. of Plasmapheresis Establishments.

Deolores D. Menendez and Emeline L. Acton, Tampa, Fla., for defendants-appellees.

Before FAY and HENDERSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

Appellant Automated Medical Laboratories, Inc. ("Automated") filed a civil action against appellees Hillsborough County, Florida (the "County") and Hillsborough County Health Department (the "Department") in the United States District Court for the Middle District of Florida. Appellant challenged the constitutionality of County Ordinances 80–11 and 80–12 ("County Ordinances") and the rules and regulations promulgated thereunder. Following a nonjury trial, United States District Court Judge William J. Castagna rejected all of Automated's constitutional attacks on the local legislation, including its federal pre-emption attack, except for the claim that § 7 of Ordinance 80–12 and § 4 of the rules and regulations imposed an impermissible burden on interstate commerce. This Court finds that the County Ordinances are pre-empted by federal regulation. Therefore, the district court holding that § 7 of Ordinance 80–12 and § 4 of the rules and regulations are invalid is affirmed, and the holding that the remainder of the County Ordinances are valid is reversed.

## I. BACKGROUND

Automated is a Florida corporation that operates, through subsidiary corporations, eight blood plasma centers in the United States. One of the centers, Tampa Plasma Corporation ("TPC"), is located in Tampa, Hillsborough County, Florida. Automated's plasma centers collect blood plasma from paid donors by plasmapheresis. Plasmapheresis is a process whereby, during a single procedure, blood is removed from a human donor, the plasma is removed from the whole blood, and the red blood cells are

returned to the donor. Automated sells the plasma to pharmaceutical concerns, which use it in the manufacture of pharmaceutical products such as tetanus vaccine, albumin, and anti-hemophilic factor.

Prior to the enactment of the County Ordinances, the Food and Drug Administration of the United States Department of Health and Human Services ("FDA") had issued regulations, which are contained in 21 C.F.R. §§ 600.3–680.26 (1983) (the "federal regulations"), that established standards and procedures for plasmapheresis operations. The federal regulations provide for FDA inspection of plasmapheresis facilities, establish standards for personnel and physical plants, necessitate licenses for plasmapheresis products and facilities, and establish human blood product standards, including the means to select suitable plasmapheresis donors.

In conformance with the federal regulations, TPC selects plasma donors on the basis of medical history, tests, and physical examinations. On each potential donor's initial visit, and at four-month intervals thereafter, TPC's staff physician reviews the candidate's medical history, performs a physical examination, and decides whether to reject or accept the candidate. If the candidate is accepted, the physician explains the plasmapheresis procedure as well as its associated risks and obtains the candidate's written informed consent to having the plasmapheresis procedure performed. In addition to the regularly scheduled staff physician's review and examination, nonmedical employees of TPC, who are trained and supervised by the staff physician, review the candidate's medical history prior to each donation of plasma. Nonmedical employees also determine, prior to each donation of plasma, that the candidate's weight, body temperature, blood pressure, pulse rate, serum protein, and hematocrit value are within the limits established by the federal regulations.

In conformance with the federal regulations, TPC has established procedures for eliminating from its donor population persons whose plasma could contain hepatitis virus. The staff physician rejects any candidate who has a history of viral hepatitis, a history of addiction to self-injected narcotics, or who has, within the preceding six months, had close contact with anyone having viral hepatitis, undergone major surgery, received whole blood or any human blood derivative known to be a possible source of viral hepatitis, or been tattooed. In addition, TPC sends a sample of each donation of plasma it collects to an outside laboratory operated by another wholly owned subsidiary of Automated to be tested for hepatitis contamination. If a sample is found to be contaminated, TPC destroys the unit of plasma from which the sample was taken and permanently rejects the donor from whom that unit was collected.

TPC has also established procedures for eliminating candidates who have exceeded the volume and frequency limits for plasma donations established in the federal regulations. To monitor the frequency with which a person donates plasma, TPC has established a donor identification system. At the time of a donor's first visit, TPC requires two forms of identification to establish the donor's identity. To identify the donor on subsequent visits, TPC provides the donor with an identification card, to which is affixed the donor's photograph. In addition, TPC establishes for each donor a permanent donor record file, which contains the donor's photograph and signature, as well as descriptive identifying information (address, telephone number, birthdate, sex, height, eye and hair color, race, and blood type), written reports of the donor's physical examinations, signed consent forms, and written records documenting every plasma donation made. For each donation, TPC documents the date of donation, the bleed number, the donor's medical history and laboratory test results, and the volume of whole blood and red blood cells returned. By means of a permanent donor record file, TPC can deter any attempted donation which would result in a potential donor subjecting his or her health to risks by exceeding the amount and frequency limits set forth in the federal regulations.

TPC is not required by the federal regulations to coordinate its donor identification system with that of other plasma centers in

the County. If, however, circumstances warrant the checking of a potential donor's identity with another plasmapheresis center, TPC's phlebotomists examine both arms of the potential donor for signs of recent needle marks. Any potential donor who evidences recent needle marks that cannot be attributed to previous donations reflected in his or her permanent donor record file is referred to the staff physician for further evaluation.

The federal regulations provide for the inspection of TPC by an FDA official at least once every two years. The FDA inspection covers all aspects of the condition of TPC's facility, equipment, and records, as well as the methods used by TPC in collecting, processing, testing, storing, and shipping the plasma it collects. During the four years preceding the trial of this action, TPC was inspected approximately six times by the FDA. Those inspections apparently failed to reveal any deficiency in TPC's plasmapheresis operation other than a noisy fan or air conditioner in the staff physician's office, which allegedly made it difficult for one physician to communicate well with potential donors, forms that needed to be reprinted to make them clearly legible, and the observation, contested by TPC at the time of the inspection, that the staff physician had once "checked off" certain parts of a potential donor's physical examination form before actually performing them.

On November 26, 1980, the County adopted Ordinances 80–11 and 80–12. Ordinance 80–11 imposes a license tax and conditions the issuance of a license on, among other things, agreement by the blood plasma donor center to "reasonable and continuing access" by Department personnel for inspections, a public hearing, and continuously updated information regarding the owners, employees, equipment, and facilities.

The stated purpose of Ordinance 80–12 is "to provide a system for the registration and identification of and the gathering of medical data applicable to Commercial Blood Plasma Vendors as being in the common interest of the health of the people of Hillsborough County." On March 5, 1981, the Department issued rules and regulations pursuant to Ordinance 80–12. Ordinance 80–12 requires that a potential donor must undergo a medical examination and obtain a "certificate of good health" before participating in the plasmapheresis process within the County. The regulations require that a potential donor present that certificate, together with his or her own sworn affidavit stating that he or she has not been detained or treated for acute or chronic alcoholism during the preceding twelve months, to the Department. The Department then issues its own identification card to the potential donor. This identification card permits the potential donor to undergo plasmapheresis for a period of six months only at a single specified plasmapheresis facility located within the County.

Ordinance 80–12 also requires that TPC submit to the Department on a daily basis information as to each plasmapheresis procedure performed, including the following: the date of the procedure; the name, address, age, weight, height, sex, identification number, and current hematocrit value of the donor; the results of the donor's breath analysis; the amount of whole blood removed and the proportion of red cells returned; and the results of testing for hepatitis. Neither the ordinance nor the regulations indicate what use the Department is to make of this information. Ordinance 80–12 and the regulations also require TPC to pay the Department a fee of $1.00 for each plasmapheresis procedure it performs. The purpose of this fee seems to be limited to maintaining the bureaucracy needed to store the information provided by TPC.

Ordinance 80–12 authorizes the Department to inspect TPC periodically, even though the Department apparently employs no qualified inspector. The regulations provide that such inspections shall occur at least annually. Finally, Ordinance 80–12 subjects TPC to criminal sanctions for violation of its provisions.

## II. DISCUSSION

The first issue before this Court is whether County Ordinances 80–11 and 80–12 and

the rules and regulations promulgated thereunder are pre-empted by the federal scheme.

■■■ The rationale underlying the pre-emption doctrine is that the Supremacy Clause invalidates state laws that "interfere with or are contrary to, the laws of congress...." *Gibbons v. Ogden,* 9 Wheat. 1, 211, 6 L.Ed. 23 (1824). Pre-emption of state law by federal statute or regulation is not favored in the absence of persuasive reasons. *Chicago & North Western Transportation Co. v. Kalo Brick & Tile Co.,* 450 U.S. 311, 317, 101 S.Ct. 1124, 1130, 67 L.Ed.2d 258 (1981); *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963). The touchstone of a pre-emption analysis is congressional intent, which may be either express or implied. *Fidelity Federal Savings & Loan Association v. De La Cuesta,* 458 U.S. 141, 151, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664, 675 (1982); *Jones v. Rath Packing Co.,* 430 U.S. 519, 529, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977); *Howard v. Uniroyal, Inc.,* 719 F.2d 1552 at 1555–56 (11th Cir.1983). In *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. at 143, 83 S.Ct. at 1218, 10 L.Ed.2d 248, the Supreme Court stated a two-pronged analysis for pre-emption claims: "Does either the nature of the subject matter, ... or any explicit declaration of congressional design to displace state regulation, require [the challenged legislation] to yield to the federal [regulatory scheme]?" We must first examine the federal law for an explicit declaration of Congress's intent to pre-empt state law.

Blood and blood components are biological products subject to the Public Health Service Act, 42 U.S.C.A. § 262 (1982), and are drugs subject to the Federal Food, Drug, and Cosmetic Act, 21 U.S.C.A. § 321(g)(1) (1972). *See Blank v. United States,* 400 F.2d 302, 305–06 (5th Cir.1968); *United States v. Calise,* 217 F.Supp. 705, 709 (S.D.N.Y.1962). The Public Health Service Act establishes licensing and product standards and the Federal Food, Drug, and Cosmetic Act provides that unadulterated drugs may not be shipped in interstate commerce. Neither statute expressly precludes state action[1]. Nor do the applicable regulations explicitly dictate pre-emption[2]. *See* 21 C.F.R. §§ 600.3–680.26 (1983).

■■ Having found no express intent to pre-empt state law, we next examine Congress's implicit intent in enacting the federal scheme. "Where Congress has not stated specifically whether a federal statute has occupied a field in which the states are otherwise free to legislate, different criteria have furnished touchstones for decision." *Pennsylvania v. Nelson,* 350 U.S. 497, 501–

1. The attorney for the American Blood Resources Association and the Florida Association of Plasmapheresis Establishment, parties who appeared as amici curiae, argue that section 351 of the Public Health Service Act explicitly expresses Congress's intent to pre-empt state law. Section 351 provides in relevant part:

(a) No person shall sell, barter or exchange, ... or send, carry or bring for sale, barter or exchange ... any ... blood, blood component or derivative ... unless (1) such ... blood, blood component, or derivative ... has been propagated or manufactured and prepared at an establishment holding an unsuspended and unrevoked license, issued by the Secretary as hereinafter authorized, ....

(d) Licenses for the maintenance of establishments ... may be issued only upon a showing that the establishment and the products for which a license is desired meet standards, designed to insure the continued safety, purity, and potency of such products, prescribed in regulations .... All such licenses shall be issued, suspended, and revoked as prescribed by regulations....

42 U.S.C.A. § 262 (1982).

This Court does not find that the statute contains express language indicating pre-emption. *Cf., Armour and Company v. Ball,* 468 F.2d 76 (6th Cir.1972), *cert. denied,* 411 U.S. 981, 93 S.Ct. 2267, 36 L.Ed.2d 957 (1973) (federal statute in question expressly provided that requirements in addition to, or different than, those made under the statute may not be imposed by any state).

2. "Federal regulations have no less pre-emptive effect than federal statutes." *Fidelity Federal Savings & Loan Association v. De La Cuesta,* 458 U.S. 141, 151, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982) (Supreme Court found pre-emption where the preamble accompanying the regulations unequivocally expressed *intent to* pre-empt conflicting state law). *Accord, United States v. Jones,* 707 F.2d 1334, 1336–37 (11th Cir.1983).

02, 76 S.Ct. 477, 479–80, 100 L.Ed. 640 (1956) (footnote omitted). *Accord Howard v. Uniroyal, Inc.,* 719 F.2d 1552 at 1556 (11th Cir.1983). Three tests are set out in *Pennsylvania v. Nelson* to determine if state law is implicitly pre-empted.

The first test is whether the federal scheme is so pervasive as to make reasonable the inference that Congress left no room for the states to supplement it. *Pennsylvania v. Nelson,* 350 U.S. at 502, 76 S.Ct. at 480, 100 L.Ed. 640. The federal scheme set out in the statutes and implementing regulations at issue here is comprehensive. The three basic requirements of section 351 of the Public Health Service Act ("Act") are that each establishment producing a biological product be licensed, each product be licensed based on standards designed to insure safety, purity, and potency, and that the package and labeling meet specified standards. 42 U.S.C.A. § 262 (1982). Within the federal regulations implementing the Act, 21 C.F.R. §§ 600.3–680.26 (1983)[3], one part deals specifically with "Source Plasma (Human)," which is defined as the fluid portion of human blood collected by plasmapheresis and intended as source material for further manufacturing use. 21 C.F.R. §§ 640.60–640.76 (1983)[4]. Other portions of the regulations implementing the Act also apply to plasmapheresis[5].

The federal regulations are broad in scope and cover virtually every phase of the plasmapheresis process. The pervasiveness of the regulatory scheme makes it reasonable to infer that Congress left no room for local ordinances to supplement it. *See Howard v. Uniroyal, Inc.,* 719 F.2d 1552 at 1559 (11th Cir.1983). Nevertheless, pre-emption is not to be inferred merely from the comprehensiveness of the federal scheme. *New York State Department of Social Services v. Dublino,* 413 U.S. 405, 415, 93 S.Ct. 2507, 2514, 37 L.Ed.2d 688 (1973).

The second test under *Pennsylvania v. Nelson* is whether the federal statute touches a field in which the federal interest is so dominant that the federal system must be assumed to preclude enforcement of state laws on the same subject. *Pennsylvania v. Nelson,* 350 U.S. at 504, 76 S.Ct. at 481, 100 L.Ed. 640. Congress has maintained extensive and comprehensive control over the nation's blood collection since 1946. 38 Fed.Reg. 2966 (1973). The collection of blood is an area of national concern, for "[h]uman blood is a priceless resource." 39 Fed.Reg. 18614 (1974). According to the Commissioner of Food and Drugs:

The promulgation of standards for these biological drugs is part of an existing collection, requirements of the plasmapheresis procedure, immunization of donors, testing for hepatitis, processing of the blood, pooling, inspection, labeling, manufacturing responsibility, records, reporting of fatal donor reactions, modification of source plasma, alternate procedures, and products stored or shipped at unacceptable temperatures.

---

**3.** Pursuant to Section 361 of the Act, 42 U.S.C.A. § 264 (1982), and under authority delegated to him, 21 C.F.R. § 5.10, the Commissioner of Food and Drugs is authorized to promulgate regulations. When an administrator promulgates regulations intended to pre-empt state law, the court will not disturb his efforts unless he has exceeded his statutory authority or acted arbitrarily. In examining pre-emption regulations, the court must ask whether the administrator intended to pre-empt state law, and if so, whether that action is within the scope of the administrator's delegated authority. *Fidelity Federal Savings & Loan Association v. De La Cuesta,* 458 U.S. at 151, 102 S.Ct. at 3022, 73 L.Ed.2d 664. In this case, there is no contention that the regulations promulgated pursuant to the Act exceed statutory authority. It does not appear to the Court that the regulations extend beyond the authority granted by Congress.

**4.** The regulations prescribe rules as to consent of a prospective donor, medical supervision of the procedure, suitability of donors, method of

**5.** The subjects included within the remaining regulations are establishment standards and inspection, 21 C.F.R. §§ 600.3–600.22 (1983); licensing, 21 C.F.R. §§ 601.1–601.33 (1983); good manufacturing practices for blood and blood components, 21 C.F.R. §§ 606.3–606.170 (1983) (with specific sections relating to personnel, facilities, equipment, supplies and reagents, standard operating procedures, finished product and laboratory controls, labeling, records, and reports); establishment registration and product listing, 21 C.F.R. §§ 607.3–607.65 (1983); general biological products standards, 21 C.F.R. §§ 610.1–610.65 (1983) (including standards of potency, hepatitis requirements, dating periods, and labeling standards).

effort to increase the quality of blood related health care in this country. Pursuant to the findings of a special Task Force in Blood Banking, the Secretary of Health, Education, and Welfare has established a *comprehensive National Blood Policy.* One of the fundamental methods prescribed by the Secretary to implement the policy is to "employ the full regulatory authorities now vested in the Federal Government ... for the purpose of assuring uniform adherence to the highest attainable standards of practice in blood banking, including plasmapheresis and plasma fractionation."

39 Fed.Reg. 18614 (1974) (emphasis added). *See also* 39 Fed.Reg. 18615 (1974) ("Such regulations are within the broad Congressional mandate to pursue the high remedial public health purpose of both the Federal Food, Drug and Cosmetic Act and the Public Health Service Act.") Furthermore, the Supreme Court has indicated that the Food, Drug, and Cosmetic Act should be given a liberal construction consistent with its overriding purpose to protect the public health. *See United States v. An Article of Drug ... Bacto-Unidisk ...,* 394 U.S. 784, 798, 89 S.Ct. 1410, 1418, 22 L.Ed.2d 726 (1960); *United States v. Dotterweich,* 320 U.S. 277, 280, 64 S.Ct. 134, 136, 88 L.Ed. 48 (1943).

Although the County possesses an interest in the health of its residents, federal laws may still preclude enforcement of the County scheme. *See Fidelity Federal Savings & Loan Association v. De La Cuesta,* 458 U.S. 141, 151, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982) (pre-emption is not inapplicable simply because real property is a matter of special concern to the states). The regulations clearly express a federal interest in establishing a uniform "National Blood Policy." *Cf. Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 143–44, 83 S.Ct. 1210, 1218, 10 L.Ed.2d 248 (1963) (the maturity of avocados is an inherently unlikely candidate for exclusive federal regulation). Therefore, we conclude that the

federal interest in plasmapheresis is dominant over any local interest.

The third test in *Pennsylvania v. Nelson* is whether the enforcement of state law presents a serious danger of conflict with the administration of the federal program. 350 U.S. at 505, 76 S.Ct. at 482, 100 L.Ed. 640. The Commissioner of Food and Drugs described the purpose of the federal scheme as follows:

> To insure there is a continued healthy donor population to serve as a source of plasma to be used in the manufacture, by the fractionation technique, of safe, pure, and potent blood products, the Commissioner is including in these proposed additional standards for Source Plasma (Human) specific provisions designed to protect the health and well-being of the donor.

37 Fed.Reg. 17420 (1972). Thus, the regulations were designed to protect the plasma donors, to insure that the product is safe, and to insure the continued existence of a healthy donor population. *See also* 39 Fed. Reg. 26162 (1974); 39 Fed.Reg. 18615 (1974); 41 Fed.Reg. 10762–63 (1976). The regulations were also enacted to establish uniform standards for blood banking. 39 Fed.Reg. 26161 (1974). The goal of uniformity runs throughout the regulations. *See, e.g.,* 48 Fed.Reg. 26313 (1983) (one reason for regulations establishing FDA inspection at least once every two years is to provide uniformity in the frequency of inspection).

The purpose of the County scheme is similar to that of the federal scheme. Section 15 of Ordinance 80–12 incorporates by reference the federal regulations appearing at 21 C.F.R. Part 640, Subpart G, Section 640.60 *et seq.* As noted earlier, these are the provisions of the federal regulatory scheme relating solely to "Source Plasma (Human)." The other provisions of the County Ordinances, however, impose additional requirements on plasmapheresis centers.[6]

---

**6.** The County scheme adds the following requirements: 1) A person may donate plasma only after obtaining a donor registration card, at a cost of $2.00, valid for six months at a single designated plasma center; 2) a donor

registration card is issued only after the donor receives a complete physical exam and a hepatitis test and presents a sworn statement that within the preceding year, he or she has not

These additional County requirements cover areas that are clearly encompassed by the federal regulations. Unlike *Smith v. Pingree,* 651 F.2d 1021, 1025 (5th Cir.1981) (Unit B), in which the court found that the federal requirements did not regulate every aspect of the area and so the state had the implied reservation to fill out the scheme, the federal scheme here regulates every aspect of plasmapheresis. The County scheme imposes burdensome and expensive requirements in addition to the requirements of the comprehensive federal scheme. If the County scheme remains in effect, the national blood policy of promoting uniformity and guaranteeing a continued supply of healthy donors will be adversely affected. *See Campbell v. Hussey,* 368 U.S. 297, 301, 82 S.Ct. 327, 329, 7 L.Ed.2d 299 (1961) (pre-emption found where act refers to need for uniform official standards); *Howard v. Uniroyal,* 719 F.2d 1552 at 1560 (11th Cir. 1983) (pre-emption found where one of Congress's objectives was to insure that there would be a uniform, consistent federal approach).

Thus, Automated has satisfied the three tests set out in *Pennsylvania v. Nelson.* This Court holds that Hillsborough County Ordinances 80–11 and 80–12 and the implementing rules and regulations are pre-empted by the federal scheme. The Court need not reach any other issues raised on appeal. Accordingly, the judgment of the district court finding Section 7 of Ordinance 80–12 and § 4 of the rules and regulations invalid is AFFIRMED, the judgment finding the remaining sections of the County Ordinances and implementing rules and regulations valid is REVERSED.

been treated for chronic or acute alcoholism; 3) the plasma center must keep and forward daily to the Department records of the donors and procedures performed; 4) each donor must undergo a breath analysis prior to donation; 5) the Department shall inspect the plasma center at least once a year, and 6) the plasma center must pay the Department $1.00 for each plasmapheresis procedure performed.