## AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS, INDUSTRIAL UNION DEPARTMENT, AFL–CIO, et al., Appellants,

### v.

### F. Ray MARSHALL, Secretary of Labor, et al.

### No. 75–1506.

United States Court of Appeals, District of Columbia Circuit.

Argued May 26, 1976.

Decided Jan. 20, 1978.

**1032** 

hoff, Washington, D. C., were on the brief, for appellants.

Michael H. Levin, Washington, D. C., Counsel for Appellate Litigation, U. S. Dept. of Labor and Patrick Tyson, Atty., U. S. Dept. of Labor, Washington, D. C., of the bar of the Supreme Court of Virginia, pro hac vice by special leave of court, for appellee, Secretary of Labor.

Carol Hunter, Sacramento, Cal., was on the brief for appellee-intervenor, State of California.

Before TAMM, LEVENTHAL and MacKINNON, Circuit Judges.

George H. Cohen and Marsha S. Berzon, Washington, D. C., with whom J. Albert Woll, Laurence S. Gold, and Elliot Bred-

Opinion for the Court filed by Circuit Judge LEVENTHAL.

Concurring opinion filed by Circuit Judge MacKINNON.

LEVENTHAL, Circuit Judge:

The Occupational Safety and Health Act of 1970 [1] (OSHA) was intended to reduce the number and severity of work-related injuries and illnesses. At the time of the passage of OSHA, there was some concern that the Act not result in the wholesale federalization of occupational safety.[2] Therefore, in § 18 of OSHA, 29 U.S.C. § 667 (1970), Congress provided that a state may reassume responsibility for occupational safety and health by submitting an acceptable plan to the Secretary of Labor. The issue presented by this case is the validity of the criteria used by the Secretary of Labor for approval of state plans.

### A. Background

There are two stages to the state plan approval process, initial approval and final approval, and the implementation of an approved plan is monitored at all times.[3] Section 18(c) of OSHA [4] sets out criteria for determining plan acceptability. "The Sec-

---

1. 29 U.S.C. §§ 651–678 (1970).

2. *See, e. g.,* S.Rep. No. 91–1282, 91st Cong., 2d Sess. 18 (1970), *reprinted in* Subcommittee on Labor of Senate Committee on Labor and Public Welfare, Legislative History of the Occupational Safety and Health Act of 1970, at 158 (June 1971) [hereinafter cited as Legislative History]; H.R.Rep. No. 91–1291, 91st Cong., 2d Sess. 32–33 (1970), *reprinted in* Legislative His-

tory 862–63; 116 Cong.Rec. 36519 (1970), *reprinted in* Legislative History 339–41 (colloquy of Senators Saxbe, Dominick, and Williams), U.S.Code Cong. & Admin.News 1970, p. 5177.

3. OSHA § 18(e), (f), 29 U.S.C. § 667(e), (f) (1970).

4. 29 U.S.C. § 667(c) (1970).

retary shall approve the plan submitted by a State . . . if such plan in his judgment" satisfies the stated criteria. These initial approvals do not necessarily cede federal jurisdiction to the state nor affect the federal enforcement program's operation within the state. Instead, there is a concurrent jurisdiction period of at least three years during which the Secretary monitors the state program for compliance with § 18(c) and may enforce the federal program. *See* 29 U.S.C. § 667(e), (f) (1970).

This case requires us to focus on the standards for evaluating state plans set forth in § 18 of OSHA, and particularly the requirement of (c)(2), that the state standards be "at least as effective" as the federal standards, and of (c)(4) and (5), that there be adequate assurances that the state agency administering the plan will have sufficient "qualified personnel" and "adequate funds" to enforce the state standards.[5]

The AFL–CIO challenged the regulations of the Secretary that interpreted "adequate funds" and "qualified personnel necessary for enforcement of [the state] standards." It claimed the regulations only parroted the language of the statute, established no rational criteria and guidelines for evaluating the sufficiency of a state's plan in terms of effective inspection and enforcement, and have resulted in state plans with wide disparities in manpower commitments and fund allotments.

The District Court upheld the Secretary of Labor's regulations on motions for summary judgment.[6] It held that "the Secretary has promulgated rational, ascertainable standards for personnel and funding."[7] The District Court interpreted those standards to require that the state effort be at least comparable to what the federal effort would have been in the absence of an approved state plan. The District Court also

held that the Secretary of Labor had consistently and properly applied those standards. The AFL–CIO has appealed that decision to this court.

**B. Contentions on Appeal**

To state adequately the contentions of the parties on appeal, we set forth the text of OSHA's § 18(c)(2), (4), (5). Those subsections state that the "Secretary shall approve the plan submitted by a State under subsection (b), or any modification thereof, if such a plan in his judgment—"

(2) provides for the development and enforcement of safety and health standards relating to one or more safety or health issues, which standards (and the enforcement of which standards) are or will be at least as effective in providing safe and healthful employment and places of employment as the standards promulgated under section 6 [29 U.S.C. § 655 (1970)] which relate to the same issues, and which standards, when applicable to products which are distributed or used in interstate commerce, are required by compelling local conditions and do not unduly burden interstate commerce,

. . . . .

(4) contains satisfactory assurances that such agency or agencies have or will have the legal authority and qualified personnel necessary for the enforcement of such standards,

(5) gives satisfactory assurances that such State will devote adequate funds to the administration and enforcement of such standards . . . . .

The AFL–CIO contends that the Secretary exceeded the scope of his authority by interpreting the requirements of § 18 to mandate only the provision of staff and funding levels "at least as effective as" the Federal enforcement program.[8] It empha-

---

**5.** OSHA § 18, 29 U.S.C. § 667 (1970). These subsections are set forth in section B of this opinion.

**6.** *AFL–CIO v. Brennan*, 390 F.Supp. 972 (D.D.C.1975).

**7.** *Id.* at 974.

**8.** The AFL–CIO is joined in its appeal by the Industrial Union Department, AFL–CIO, and the Illinois State Federation, AFL–CIO. The defendants are the Secretary of Labor and the Assistant Secretary of Labor for Occupational

sizes that (4) and (5) do not contain the "at least as effective as" criterion explicitly used in (2) and (3) of § 18(c),[9] and it argues that "adequate funds" and "qualified personnel necessary for the enforcement of such standards" mean force and funding levels sufficient to ensure that the normative standards are in fact enforced.

To demonstrate the invalidity of use of an "at least as effective as" standard for subsections (c)(4) and (5), the AFL–CIO notes that the federal benchmarks that have been employed by the Secretary are predicated on federal enforcement levels that are artificially low because the Secretary deliberately withheld commitment of adequate resources until he knew the full extent of likely state participation. It cites testimony given by Assistant Secretary of Labor George Guenther before the Senate Subcommittee on Appropriations on April 16, 1972.

> [W]e have consciously attempted to control the level of our staff resources until we get a better reading of State participation.
>
> We have had some pressure on us, as you are aware, to substantially increase our forces immediately. We have refrained from requesting those kinds of increases for the reason that we don't believe that it's responsible to beef up the Federal program to such a level, and then find the States coming onboard, and have to withdraw from that staff level.[10]

The Secretary maintains that this attitude was prompted by a lack of funding and "by Congress' repeated expressions of concern regarding possible State dislocations produced by precipitous Federal movement in this delicate area." [11]

The Secretary argues that subsections (4) and (5) must be read in light of subsection (2), which he characterizes as the "overriding criterion." [12] Subsection (2) states that the Secretary shall approve the state plan if it, *inter alia*, "provides for the development and enforcement of safety and health standards relating to one or more safety or health issues, which standards (and the enforcement of which standards) are or will be at least as effective in providing safe and healthful employment and places of employment as the standards promulgated under section 6." [13] The Secretary maintains that with the inclusion of the parenthetical phrase, Congress indicated that state plan approvals were to be governed by direct comparison of state funding and personnel with that of the federal program which would otherwise be operative.

## C. Court's View of OSHA § 18(c)

After consideration of the text, legislative history and purpose of OSHA, we reach a conclusion as to the meaning of the statute that is different from that of either party—but that comports, we think, both with an effective enforcement program and a dynamic federal-state partnership in occupational health and safety matters. We hold that in referring to personnel and funding levels in terms of adequacy or sufficiency, Congress clearly intended that the states assure effective enforcement programs. In granting initial approval to state plans, the Secretary can consider—as interim federal benchmarks—whether the state is willing to provide personnel and funding "at least as effective as" that pro-

---

Safety and Health. The State of California has intervened on behalf of the Secretary.

**9.** 29 U.S.C. § 667(c)(3) (1970):

(c) The Secretary shall approve the plan submitted by a State under subsection (b) or any modification thereof, if such plan in his judgment—

 * * * * * *

(3) provides for a right of entry and inspection of all workplaces subject to this chapter which is at least as effective as that provided in section 8 [29 U.S.C. § 657 (1970)], and

includes a prohibition on advance notice of inspections . . . . .

**10.** Hearings on H.R. 15417 Before a Subcommittee of the Senate Committee on Appropriations, 92d Cong., 2d Sess., pt. 2, at 1421 (1972).

**11.** Brief for Secretary of Labor at 52 n.40.

**12.** Brief for the Secretary of Labor at 40.

**13.** OSHA § 6, 29 U.S.C. § 655 (1970), authorizes the Secretary to promulgate national occupational safety and health standards.

vided by the federal government. But such interim federal benchmarks must be part of an articulated, coherent program calculated to achieve a fully effective program at some point in the foreseeable future. As we discuss in part D of this opinion, the interim federal benchmarks that have been used for initial approval of state plans are not part of such a program. To comply with the mandate of the statute, the regulations and program directives establishing the benchmarks must be supplemented.

We now set forth the several pertinent considerations that have led us to our interpretation of § 18(c).

### 1. Statutory Language

We think, along with plaintiffs, that there is significance in the fact that the "at least as effective as" criterion was explicitly set forth in § 18(c)(2) as to *standards* in state plans, but was omitted when Congress moved from standards to enforcement in subsections (4) and (5). The omission of the "at least as effective as" language from (4) and (5), dealing with personnel and funds, is the more conspicuous in view of insertion of these words in subsection (3). The Secretary's argument that the use of the "at least as effective as" language in subsection (2) is an overriding criterion, with no need for explicit repetition in (4) and (5), is difficult to reconcile with the existence of such repetition in (3) of § 18(c).

■ In interpretation, we must serve the legislative purpose. The purpose of OSHA, as explicitly set forth in § 2(b)(10), is "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources . . . by providing an effective enforcement program."[14] This clear statement of purpose in § 2 gives context for the use of such terms as "adequate" and "necessary" in § 18(c), the context of providing "an effective enforcement program." "It is our duty 'to give effect, if possible, to every clause and word of a statute' . . . rather than to emasculate an entire section."[15]

### 2. Legislative History

■ It is a well-known canon of construction that the language of a statute is the best indication of legislative intent. *Browder v. United States*, 312 U.S. 335, 338, 61 S.Ct. 599, 85 L.Ed. 862 (1941). Here we find that the legislative history also comports with our interpretation of the statutory language.

Subsections (2), (4) and (5) of 18(c) moved from introduction to passage virtually without change, and were not the subject of extensive discussion in Congressional committees or in floor debates.[16] The Senate Report states:

Moreover, whenever a State wishes to assume responsibility for developing or enforcing standards in an area where standards have been promulgated under this act, the State may do so under a state plan approved by the Secretary of Labor. The plan must contain assurances that the State will develop and enforce standards at least as effective as those developed by the Secretary, that the State will have the legal authority, per-

---

**14.** 29 U.S.C. § 651(b)(10) (1970).

**15.** *United States v. Menasche*, 348 U.S. 528, 538–39, 75 S.Ct. 513, 520, 99 L.Ed. 615 (1955) (quoting *Montclair v. Ramsdell*, 107 U.S. 147, 152, 2 S.Ct. 391, 27 L.Ed. 431 (1883)).

**16.** In the 91st Congress, three Senate bills and six House bills proposed some form of an Occupational Safety and Health Act. All but one of those bills had provisions similar to OSHA § 18(c)(2), (4), (5), 29 U.S.C. § 667(c)(2), (4), (5).

The exceptional bill, H.R. 4294, provided that the Secretary may decline to assert jurisdiction over an issue "governed by any State law whenever in his opinion the provisions of such State law and their enforcement would reasonably carry out the objectives of this Act." Therefore almost all the versions of the bill contained the repetition discussed in text. This may explain why the structure of the state plan section did not receive close analysis in committees or on the floor.

sonnel and funds necessary to do the job . . . .[17]

The House Report contains a virtually identical passage.[18]

The language of both committee reports carefully distinguished between standards and the means to enforce them. As to the latter, once the standards were set there were to be assurances that the state would have the resources "necessary to do the job." The language straightforwardly expresses a Congressional intention that approved state programs assure sufficient resources to effectively enforce the standards set forth in those programs.

The foregoing recognizes a requirement for state plans. It does not, however, mandate a rigid approach toward state efforts that would make the perfect the enemy of the good. The legislative history develops another consideration of material importance—and that is time.[19] Congress was aware that both the states and the federal government would need time to bring a program of this type on-line. Thus § 18(c)(4) states that a state plan must give "satisfactory assurances that such agency or agencies *have or will have* the legal authority and qualified personnel necessary for the enforcement of such standards." [20] Time is needed to staff up enforcement efforts. Moreover, switching jurisdiction from the state to federal authority entails significant transition costs. Concern was expressed on the floor of the Senate lest precipitate federal preemption mean the loss of the services of the state occupational safety and health machinery to the detriment of the overall effort.[21]

### 3. Overall Ascertainment of Legislative Purpose

█ If we were controlled by the text alone, it might be argued that the "at least as effective as" concept is completely irrelevant for subsections (c)(4) and (5), where those words are omitted. An overall ascertainment of legislative purpose, however, bids us take into account practical necessities, including the concern for precipitate preemption brought out in the legislative history. In the application of a new federal statute, there is a likely Congressional contemplation of maximizing use of existing state machinery. "Federalism" cannot be invoked categorically where it would defeat the national objective. A sensitivity to state participation has value, however, where the state administration can be integrated with federal application—either as a supplement, or as a stopgap measure, or as a delegation under federal control. We have been instructed that a federal statute should not be given a rigid interpretation that would "prevent States from undertaking supplementary efforts toward [the] very same end." *New York State Department of Social Services v. Dublino*, 413 U.S. 405, 419, 93 S.Ct. 2507, 2516, 37 L.Ed.2d 688 (1973).[22]

17. S.Rep. No. 91–1282, 91st Cong., 2d Sess. 18 (1970), *reprinted in* Legislative History 158, U.S.Code Cong. & Admin.News 1970, p. 5194.

18. H.Rep. No. 91–1291, 91st Cong., 2d Sess. 32 (1970), *reprinted in* Legislative History 862.

19. For example, Congress realized that it would take time for the Secretary to develop federal standards and gear up the federal effort. Thus OSHA § 18(h), 29 U.S.C. § 667(h) (1970), provides that "[t]he Secretary may enter into an agreement with a State under which the State will be permitted to continue to enforce one or more occupational health and safety standards in effect in such State until final action is taken by the Secretary with respect to a plan submitted by a State under subsection (b) of this section, or two years from the date of enactment of the Act [December 29, 1970], whichever is earlier."

Representative Hathaway, who introduced this subsection as an amendment on the floor of the House, described it as an attempt to deal with "an hiatus between the effective date of the Federal standard and the time when the Secretary will actually be geared up to enforce that standard." 116 Cong.Rec. 38706 (1970), *reprinted in* Legislative History at 1067.

20. 29 U.S.C. § 667(c)(4) (1970) (emphasis added).

21. 116 Cong.Rec. 36519 (1970) *reprinted in* Legislative History 339–41 (colloquy among Senators Saxbe, Dominick and Williams).

22. In *Dublino* the Supreme Court interpreted the 1967 amendments to the Social Security Act so as to negative preemption. Under OSHA there is clearly a federal preemption in

■ Taking all these considerations into account, we hold that it is reasonable for the Secretary to employ federal "at least as effective" benchmarks under (4) and (5) of § 18(c), if those objectives are integrated with the objectives of "necessary" personnel and "adequate" funds. The resultant of these vectors of analysis is the approval of current federal levels of personnel and funds as benchmarks for state plans, provided they are part of a coherent program to realize a fully effective enforcement effort at some point in the foreseeable future. These benchmarks must be pragmatic in terms of time frame but not lax in goal, and sustain state efforts that are reasonably adapted to realize the Act's objectives within the same time frame as the federal effort.

### D. Analysis of Regulations

Plaintiffs contend that the regulations and program directives that establish the federal benchmarks do not satisfy the statutory criteria. In support of his motion to dismiss and his position that he has rationally considered the relevant factors in administering § 18(c)(4) and (5), the Secretary submitted regulations and program directives to the District Court. He also submitted documents on the approved Illinois Plan, which has been used in this litigation as a representative state plan the approval

of which illustrates the Secretary's review standards and procedures.[23]

■ In this action for declaratory and injunctive relief, the appropriate standard of review is whether the Secretary's regulations are arbitrary and capricious or inconsistent with the governing statute. 5 U.S.C. § 706(2)(A) (1976). The District Court held them valid.

■ The question before this court is whether the standards used by the Secretary reflect the "mandate in the legislative charts" and a reasoned course in achieving that mandate.[24] Although the intermediate federal benchmarks used in approving and monitoring state plans need not require a fully staffed effort, there is a duty on the Secretary to articulate how those benchmarks relate to the ultimate realization of a full effort.[25]

■ Given the obligation to provide "adequate" funds and "necessary" personnel, the Secretary's regulations would obviously be deficient if they contemplated that state plans that received approval on the basis of an interim benchmark could then stand still, without any obligation to keep pace with the improving federal effort. At oral argument, government counsel advised that the states were required to upgrade their programs. The court asked for supplemental memoranda on this matter.[26] The

the first instance, but the spirit of cooperative federalism underlying *Dublino* warrants a reasonable construction of delegation provisions to avoid counterproductive frustration of state efforts.

23. The State of Illinois withdrew its plan after this litigation was initiated. 40 Fed.Reg. 24523 (June 9, 1975) (notice that Illinois plan withdrawal is effective June 30, 1975). Since that plan was selected only as representative of state plans that had received initial approval by the Secretary, the withdrawal does not moot this litigation, a point conceded by the Secretary of Labor. Brief for Secretary of Labor at 25 n.20.

24. *See Greater Boston Television Corp. v. FCC,* 143 U.S.App.D.C. 383, 393, 444 F.2d 841, 851, *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

25. We therefore reject the Secretary's contention that "present implementation of the Secretary's 'moving target' test for comparative State efficacy is completely beyond the scope of the complaint." Supplemental Memorandum for the Secretary at 15.

26. The questions that this court directed to the parties in the order of June 3, 1976 were as follows:
 1. The court is interested in the representation of government counsel that the states are required to make incremental improvements in their programs, in the areas of personnel and funding, when the federal government makes incremental improvements in its program. Counsel are requested to furnish to the court pertinent references and excerpts from (a) state plans already approved; (b) regulations, extant or previously in effect; (c) interpretations of regulations.
 2. Assuming that there is some "sliding scale" or "moving target" requiring the

government's memorandum states that state programs are required to keep pace with the federal effort throughout the initial and final approval stages.[27] What is unclear is what was the Secretary's "reasoned course" in achieving OSHA's mandate—how did the lower initial benchmark levels relate to ultimate realization of the Act's goals.

The Secretary describes the benchmark revision process as follows:

> From 1972 to June 1974—the complete period covered by [the] initial approvals [contested in this case]—there was no need to update the original benchmarks. Those benchmarks drew on the State plan portion of the Fiscal 1973 OSHA budget for their projection of the maximum number of inspectors the Federal pro-

gram might deploy; that budget totalled $69.3 million, of which $27 million was allocated to State plan activities, principally funding of initially-approved State programs; and the Fiscal 1974 budget totalled only $70.4 million, of which $25 million—*a reduced amount*—was allocated to State plans. See Addendum C. Thus the original benchmark figures were *a fortiori* appropriate as a numerical guide for comparative efficacy through Fiscal 1974.

By Fiscal 1975 data began to become available which enabled not merely an updating based on increased Federal funds for that year, but a more sophisticated benchmark concept. This concept formulated the total number of inspectors needed for an ideally effective pro-

---

states to keep pace with the federal government, how is this requirement presently implemented?

a. Specify what steps, if any, have been taken to update the "federal benchmarks" to keep pace with realized and projected improvements in the federal program.

b. Has the original benchmark evaluation been updated in fact to take account of federal improvements?

c. Advise how the states have been apprised of their obligation to keep pace with federal developments, whether this has been done (a) Informally; (b) Through monitoring—and if so, how; (c) By communication of specific numbers or standards; (d) If in other ways, please specify.

d. Has an approach been developed that takes account of the differences in numbers of target industries, affected workers, geography, etc. in developing proportional improvement figures for the states with approved plans?

27. With respect to final approvals of state plans under OSHA § 18(e), 29 C.F.R. § 1902.-32(e) (1976) provides:

Once a State's plan . . . has been given an affirmative 18(e) determination, the State is required to maintain a program which will meet the requirements of section 18(c) and will continue to be "at least as effective as" the Federal program operations in the issues covered by the determination. As the Federal program changes and thereby becomes more effective, the State is correspondingly required to adjust its program at a level which would provide a program for workplace safety and health which would be "at least as effective as" the improvements in the Federal program.

The Assistant Secretary is required to state in every final approval notice that he may revoke any approval "if his continuing evaluations . . . show that the State has substantially failed to maintain a program which is at least as effective as operations under the Federal program." 29 C.F.R. § 1902.43(a)(4) (1976).

Other references to a moving target are found in 29 C.F.R. § 1953.1(c)(2) (1976):

Changes to a plan can be separated into several categories. As the State plan is implemented, supplements will be required to meet developmental schedules approved as part of the plan. These developmental step supplements must be completed within three years after commencement of operations under the plan. The development of the Federal program and the continuing evaluation of the State programs will also require that changes be made in the plans. In addition there could be State initiated changes that would have an impact on the effectiveness of the State program.

And 29 C.F.R. § 1955.3(a)(3) authorizes the Assistant Secretary to begin withdrawal proceedings "where a State . . . fails to continue to maintain its program in accordance with the . . . changes in the Federal program."

The Secretary also presented examples of assurances of compliance with moving benchmarks found in state plans. Supplemental Memorandum for the Secretary at 6–7 (Illinois and California).

These are only a few examples of many regulations and program directives listed by the Secretary which clearly suggest that the states must keep pace with the federal effort.

gram without regard to budget or administrative limitations; measured the total available Federal and State inspectors against the ideal total for each; then compared the two percentages to determine whether the State program was "as effective" at that time as the Federal program in the area of enforcement personnel.[28]

The Secretary submitted a "relatively final draft" of the "OSHA System for Enforcement Planning and Resource Allocations"[29] which sets out the ideal number of inspectors for a total Federal-State program. These data are based on information concerning the relative hazardousness of various industries in different geographical areas and the number of safety inspections necessary as a result. We are informed that this system was developed for OSHA planning and budget reasons as well as state plan evaluation. "[I]ts Federal figures for nonplan States do not represent the actual Federal deployment in any State, but an even projection designed to provide a theoretical model of equitable Federal enforcement with available Federal funds."[30] But the Secretary concludes "the ultimate test is still a direct comparison of Federal vis-a-vis State personnel to determine approved States' current 'as effective' status."[31]

In the last analysis, the "OSHA System for Enforcement Planning and Resource Allocation" does nothing to justify the standards employed in granting initial plan approval. It remains the case that however poor the federal effort, a state plan is approved if it is marginally better. For the years 1972 to 1974 this was clearly the case. For 1975, again, the state effort is compared with the federal effort "as is". The federal effort is now described as a percentage of what is really needed, but all that is required of an approved state plan is that its percentage be at least as high as that of the federal effort. Although we think Congress conceded the Secretary some practical flexibility in administering OSHA, this rudderless scheme of plan approval cannot be reconciled with the mandate that state plans assure "necessary" personnel and "adequate" funds. The Secretary must have some plan to reach that objective and the states must subscribe to that timetable as a precondition to implementation of the state plan.

■ We disagree with the District Court that the Secretary's regulations on number of personnel and funding provide the kind of specificity required for administering a state plan approval program in a consistent and rational manner. As to the "necessary" number of state personnel, the District Court relied principally on Program Directive No. 72–24.[32] But that Directive is simply a list of general considerations; there is no guidance given as to how these various considerations are to be weighed.[33]

---

**28.** Supplemental Memorandum for the Secretary at 16–17 (emphasis in original).

**29.** Supplemental Memorandum for the Secretary, Appendix E.

**30.** Supplemental Memorandum for the Secretary at 18.

**31.** *Id.*
The ideal benchmark is also one of absolute sufficiency and does not reflect any consideration of training and staffing lags. Therefore it provides little guidance as to what constitutes reasonable interim benchmarks. Of the 21 states listed in the Secretary's supplemental memorandum, only 5 meet the ideal benchmark. *Id.* at 19–20. In nonplan states, the federal effort meets only 23% of the ideal. *Id.* at 19.

**32.** Appendix to Appellant Brief at 274–76.

**33.** OSHA Program Directive No. 72–24 provides in relevant part:
a. Although Regulations Part 1902 set forth indices of effectiveness for standards and enforcement provisions under State plans, neither the regulations nor the Act provide definition of the term "sufficient number of adequately trained and qualified personnel necessary for the enforcement of the standards."
b. In presenting its proposal for staffing under an 18(b) plan, a State should relate its proposal to the factors discussed below in order to show sufficiency.
c. The basic factor is the scope of the State plan under section 1902.2(c) of the Regulations. Under these provisions, the scope will necessarily be defined in terms of the issues covered, the standards included in the issues, and the employers and employees covered within the issues. The scope of the State

The program fares no better, in terms of satisfying OSHA's objectives, with the promulgation of Program Directive No. 72–26. All that directive requires is that the State assure a program as effective as "a theoretical construct of what the Federal program would be without state participation" and with current appropriations.[34] On reading what has been presented to us, we have some questions as to the nature of the "theoretical construct."[35] But that is not the central issue in this case. The vice of Program Directive No. 72–26 is that it makes no attempt whatever to link the resulting benchmarks to ultimate realization of the Act's objectives.[36]

As to the requirement of "adequate funds" we agree with the Secretary that the "overall sufficiency of a State's funding is inevitably tested by the personnel sufficiency criteria." "[E]nforcement staff and plan would thus be both quantitative (employers and employees affected) and qualitative (hazards for which protection is provided). Under section 18(c)(4), necessary enforcement staff is related to the enforcement of standards, but the population affected determines the breadth of the application of the standards. Where the State plan is "developmental" with regard to the issues or standards for which the responsibility for enforcement is assumed, staffing would be affected by the projected timetable for implementation of the plan.

d. After determining the scope of the State plan, additional factors could affect the sufficiency showing, such as geography, organizational structure, and degree of experience and training of staff. Thus, accessibility of staff over a wide geographical area, or in a small highly concentrated area, as well as experience and competency of staff would affect the sufficiency of their number.

e. An important additional factor bearing on the sufficiency of State staffing would be the program goals for the State program and staff needed to accomplish them. State program goals are required under section 1902.-3(*l*) of the Regulations to be "consistent with the goals of the Act." It should be noted that an important feature of the Federal compliance staff utilization in relation to the goals of the Act has been the establishment of inspection priorities, which include emphasis on special targets. Such emphasis enables OSHA to achieve 100% coverage each year of particularly high hazard industries and to focus on major health hazards. OSHA has also established a broader presence through the general inspection program. Establishments to be inspected are selected out of a random cross-section of establishments of all sizes, in all covered industries.

**34.** The methodology for determining benchmarks is set out in Program Directive No. 72–26 as follows:

*Methodology.* The interim benchmark level for FY 1973 represents a theoretical construct of what the Federal program would be *without* state participation. It consists of the *planned* deployment [of] Federal [compliance safety and health officers] and [industrial hygienists] plus an additional 600 positions achieved by converting approximately half of the planned FY 1973 resources. The total of these *line inspection positions* were distributed by State according to the covered workforce in each State yielding the benchmark levels shown in the attachment. In some of the smaller States, e. g., Alaska and Vermont, this resulted in only one or two positions. A benchmark level of four is established as a minimum. (Emphasis in original).

As this methodology is explained in the Secretary of Labor's brief, the federal benchmark figures were arrived at by adding the total number of federal personnel available to the number that could be added if no funds were given to the states pursuant to state plans. These personnel were then divided among the states according to their relative work force sizes. Brief for the Secretary of Labor at 12–13.

**35.** It is obvious that the "theoretical construct" itself is not consistent with a fully effective enforcement program. Even if we assumed that current funding levels were calculated to realize a fully effective enforcement effort in all plan and nonplan states, an assumption that is clearly incorrect, the "theoretical construct" would not yield numbers of enforcement personnel consistent with a fully effective effort in each state. The core difficulty is that in drawing up its figures, the government starts with present funding levels, which cover 100% of the cost of federal personnel, but which, in view of § 23(g) of OSHA 29 U.S.C. § 672(g) (1970), cover not more than 50% of the cost of state personnel. Implicit in the theoretical construct is the assumption that the same funds would be provided if the federal government had *total* enforcement responsibility. Assuming comparable salary levels, this would represent a reduction in enforcement personnel equal to at least 50% of those now compensated by the states.

**36.** Program Directive No. 72–26 was rescinded by Program Directive No. 74–11. But the import of the Secretary's Supplemental Memorandum is that the numeric benchmark concept still plays a central role in the plan approval process.

**1042**

necessary support salaries and fringe benefits constitute the principal cost element in any enforcement system."[37] Once the Secretary articulates adequate personnel criteria, acceptable "adequate funding" requirements will follow.[38]

 We affirm the District Court's holding that the regulations concerning qualifications of state inspectors are valid. We find detail in these regulations sufficient to permit the Secretary to approve plans in a manner consistent with the mandate of the Act.[39]

E. *Relief*

 We declare that the Secretary has a duty to establish criteria that are part of an articulated plan to achieve a fully effective enforcement effort at some point in the foreseeable future. The "OSHA System for Enforcement Planning and Resource Allocation" has been drawn up with ideal benchmarks. Accordingly, with a planning horizon and an appreciation for administrative lags, the Secretary should be able to articulate a series of benchmarks clearly related to eventual achievement of the goals of the Act.

 This is an action for equitable relief wherein considerations of the public interest weigh heavily. We decline to enjoin implementation of any of the state plans that have been approved to date by the Secretary. The problems we have identified do not necessarily mean that the Secretary erred in giving an initial approval based on present "as effective as" criteria. What those problems require is that in addition there be an articulated and coherent program moving from an initial "as effective as" approach toward the personnel and funding levels needed for satisfactorily effective enforcement. These criteria can be provided by supplements to the approval process. We contemplate that once the Secretary has articulated his program goals and objectives in terms of personnel and funding in accordance with this opinion, the necessary resources will be sought from Congress, and the underlying criteria will be applied in the state plan approval process.[40]

The case will be remanded for entry of a decree not inconsistent with this opinion.

*So ordered.*

MacKINNON, Circuit Judge, concurring:

Congress declared the scheme of the Act to be to "[encourage] the States to assume the fullest responsibility for the administration and enforcement of their occupational safety and health laws . . . ." (84 Stat. 1591). The statutory alternative is federal administration. It is thus incongru-

---

**37.** Brief for the Secretary of Labor at 58.

**38.** This is not to suggest that the Secretary should not explicitly promulgate funding benchmarks consistent with realization of the Act's ultimate objectives. Certainly there must be funding for equipment, travel, and other necessary expenses of any enforcement program. But once the Secretary has calculated proper personnel benchmarks it should prove a relatively simple matter to draw up funding benchmarks.

**39.** *See AFL–CIO v. Brennan*, 390 F.Supp. 972, 975 (D.D.C.1975) (discussing "qualified personnel" criteria).

**40.** We realize that the Secretary may draw up his plan and find that at some point in the future Congress is unwilling to appropriate the funds requested. The significance of such actions will depend on the nature of the Congressional action and its history. It may reflect a Congressional estimate that the same goals may be achieved with less expenditure, through greater efficiency. However, it may evince a legislative judgment that the administrative goal was excessive. If Congress approves only X% of the Secretary's benchmark, a legitimate corollary would be the Secretary's approval of state plans that provide detailed assurances to meet at least X% of the Secretary's benchmark during the appropriate time frame. As this court noted in *NRDC v. Train*, 166 U.S.App.D.C. 312, 333, 510 F.2d 692, 713 (1975) (footnotes omitted):

> We think the court may forebear the issuance of an order in those cases where it is convinced by the official involved that he has in good faith employed the utmost diligence in discharging his statutory responsibilities. The sound discretion of an equity court does not embrace enforcement through contempt of a party's duty to comply with an order that calls him "to do an impossibility."

ous to suggest that a state OSHA plan must have "necessary" personnel and "adequate" enforcement funds which are substantially in excess of what the alternative federal administration would afford.

Such being the intent of the Act and Congress being its author, it is proper to gauge what Congress considered to be "necessary" and "adequate" for state administration by what amounts Congress has made available for the alternative federal administration.

The present lawsuit is overly ambitious and seeks extreme relief. Its objective is to wrap up the entire nation in one ball of wax and get a nationwide decree declaring how many inspections each state shall have and what sums each state shall appropriate for administration and enforcement. Raising issues in such a broad context prevents careful consideration of the basic problems. To my mind the largest approach should be on a state-by-state basis.

The scheme of the Act requires safety and health standards for particular hazards and these, which involve industrial activity and states of varying geographical size, differ greatly throughout the nation. The establishment of "disparate" numbers of inspectors in various states is thus a necessary fact of life. For a court to impose proper generalized personnel requirements for each state in the nation is a practical impossibility. A great deal of discretion must be left to federal and state administrators. Our task in this case is rendered more onerous by the fact that appellants are basically attacking the approval by the Secretary of some 25 state plans; but the record is devoid of the relevant facts with respect to the separate states. Under such circumstances, it is my view that the proper relief would be to remand the case for a more definite statement by appellants, order the necessary discovery, and thus develop some concrete facts upon which to determine whether the action of the Secretary has, or has not, been arbitrary and capricious. But the issues on that basis would be almost unmanageable. Thus, I join in Judge Leventhal's opinion which calls for

action that is moulded in the vein in which the Secretary states he has been approaching the problems.