**The BOARD OF TRUSTEES OF the OHIO STATE UNIVERSITY, Plaintiff,**

v.

**U.S. DEPARTMENT OF EDUCATION, et al., Defendants.**

**No. C2–88–0027.**

United States District Court, S.D. Ohio, E.D.

March 15, 1988.

Robert B. McAlister, Baker & Hostetler, John Winkler, Baker & Hostetler, Columbus, Ohio, for plaintiff.

Sharon L. Reich, Frederick M. Morgan, Jr., Dept. of Justice, Stephen Reid, Asst. General Counsel, Dept. of Educ., for defendants.

## OPINION AND ORDER

GEORGE C. SMITH, District Judge.

This matter is now before the Court for final disposition of plaintiff's, the Board of Trustees of The Ohio State University (Ohio State), request for injunctive and declaratory relief against defendants, the U.S. Department of Education, the Secretary of the Department of Education and the United States of America (Secretary). This Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1441 and 5 U.S.C. § 702. The question presented is whether the Secretary complied with Section 404 of the Carl D. Perkins Vocational Education Act, 20 U.S.C. § 2404, as enacted by Public Law 98–524, and 34 C.F.R. Parts 75, 400 and 417, when he awarded a five-year, $30 million grant to Berkeley for the operation of the the National Center for Research in Vocational Education.

### Administrative Proceedings

On August 16, 1985, the Secretary announced in the Federal Register the procedures and criteria which would be used in the competition. 50 Fed.Reg. 33,267 (1985) (to be codified at 34 C.F.R. § 417). On September 16, 1986, the Secretary announced the availability of planning grants for the stated purpose of assisting individuals, public or private agencies, organizations or institutions in developing innovative approaches for expanded activities of the National Center, and to increase the quantity and quality of applications for the National Center, 51 Fed.Reg. 32,882. On November 28, 1986, the Secretary solicited applications for the National Center that provided for an August 14, 1987 deadline, 51 Fed.Reg. 43,069 (1986). The solicitation provided that the applications were subject to compliance with the regulations in 34 C.F.R. Part 417 and The Education Department General Administrative Regulations, 34 C.F.R. Parts 74, 75, 77 and 78. On or before August 14, 1987, the Secretary received three applications for the National Center. The applicants were Ohio State, Northern Arizona University and a consortium arrangement under the guise of The

University of California at Berkeley (Berkeley).

After the August 14, 1987, closing date for the National Center grant application, the Office of Vocational and Adult Education (OVAE) reviewed each application for eligibility under 34 C.F.R. § 417.20. The OVAE was satisfied that each applicant met eligibility requirements. From August 24 through October 1, 1987, a panel of nationally recognized experts in the field of vocational education administration and research evaluated each application on the basis of the criteria contained in 34 C.F.R. § 417.31. The panel reviewed each application and awarded points based on the following selection criteria: the high quality and effectiveness of the required services and activities; quality of the management plan; quality of the key personnel; institutional experience of the applicant; adequacy of the applicant's resources; adequacy of budget and cost effectiveness; and external relationships with interested and affected entities, 34 C.F.R. §§ 417.30–31. Prior to actual award of the grant, the Secretary engaged in negotiation with the applicant having the highest standardized score (Berkeley) in order to clarify their obligations under the grant. Following the negotiation process Berkeley was designated the National Center on January 4, 1988.

## Judicial Proceedings

On January 8, 1988, Ohio State filed a complaint and a motion for a temporary restraining order and a preliminary injunction alleging that the Secretary's review of the grant applications and award of the grant violated statutory and regulatory requirements. On January 11, 1988, this Court held a hearing and granted Ohio State's motion for the temporary restraining order. On February 10–11, 1988, this Court consolidated the hearing of Ohio State's application for a preliminary injunction with the trial on the merits pursuant to F.R.C.P. 65(a)(2). The Court recognized that this case is not the proper subject of a trial *de novo, Citizens To Preserve Overton Park v. Volpe,* 401 U.S. 402, 415–416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1970). However, the purpose of the "consolida-

tion" was two-fold: first, testimony was taken to determine whether equitable relief was appropriate; and second, to clarify and amplify the actions taken by the Secretary in order to determine if they were consistent with and followed the statutory mandate regarding the National Center.

## Judicial Review

Initially, it is necessary for the Court to determine whether Ohio State is entitled to judicial review of the Secretary's action in awarding the grant for the National Center to Berkeley. The Secretary argues that the portion of the Perkins Act dealing with the National Center does not provide for any judicial review of Department of Education actions in regard to the selection of a grantee or the administration of the grant, in that other sections of the Act specifically provide for judicial review.

 Judicial review of the Secretary's decision is governed by the Administrative Procedure Act, 5 U.S.C. § 551 et seq. The APA provides that the action of each authority of the government of the United States is subject to judicial review except to the extent that statutes preclude judicial review or agency action is committed to agency discretion by law. The APA provisions embody a presumption in favor of judicial review. The right to review is not to be denied absent clear and convincing evidence of contrary legislative intent. *Lubrizol Corp. v. Train,* 547 F.2d 310 (CA6 1976). The mere fact that 20 U.S.C. § 2404 makes no provision for judicial review while other sections of the Perkins Act specifically provide for judicial review is not clear and convincing evidence that Congress intended to preclude judicial review of the National Center grant process. Furthermore, the Secretary's discretion to authorize funding for the center has been severely restricted by the enabling act, 20 U.S.C. § 2404. For these reasons the Court determines that judicial review of the Secretary's action is entirely appropriate.

## ANALYSIS

### I

 The declaratory and injunctive relief sought by Ohio State is available under 5

U.S.C. § 706, which provides that "the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." Additionally, "the reviewing court shall ... hold unlawful and set aside agency action, findings and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The general rule of APA review is that the Court shall decide all relevant questions of law and interpret statutory provisions. See, *NLRB v. Hearst,* 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944). The Secretary's actions are entitled to a presumption of regularity and this Court is not empowered to substitute its judgment for that of the agency, *Overton Park,* 401 U.S. at 415–416, 91 S.Ct. at 823 (1970). However, the presumption of regularity does not shield the Secretary's actions from a thorough, probing and indepth review, *Id.*

In order to properly review the Secretary's actions, the Court is first required to determine whether the Secretary acted within the scope of his authority. *Id.,* at 415, 91 S.Ct. at 823, quoting *Schilling v. Rogers,* 363 U.S. 666, 676–677, 80 S.Ct. 1288, 1295, 4 L.Ed.2d 1478 (1960). Thus, the Court must consider whether the Secretary properly exercised his authority to designate Berkeley as the National Center. The Secretary's authority to designate an entity as the National Center is derived in part from 20 U.S.C. § 2404.

The Perkins Act authorizes the Secretary to designate and fund a National Center for Research in Vocational Education after grant applications have been reviewed in compliance with 20 U.S.C. 2404, as enacted by Public Law 98–524. The Act provides for the establishment of a National Center which shall have as its primary purpose "the design and conduct of research and developmental projects and programs" in vocational education. 20 U.S.C. § 2404(b). The statute states in relevant part that:

> (2) The Secretary shall provide support for the National Center through an annual grant for its operation. The National Center shall be a nonprofit entity associated with a public or private nonprofit university which is prepared to make a substantial financial contribution toward its establishment. The Secretary shall, on the basis of solicited applications, designate the entity to be the National Center once every five years, acting with the advice of a panel composed of individuals appointed by the Secretary who are not federal employees and who are recognized nationally as experts in vocational education administration and research.
>
> (3) The National Center shall have a Director, appointed by the university with which it is associated ...

20 U.S.C. § 2404(a)(2)–(3). The statute simply requires the Secretary, acting with the advice of national experts in vocational education administration and research, to fund a single National Center. The organization chosen as the National Center is required to be nonprofit, associated with a university that is prepared to make a substantial financial contribution towards its establishment and have a single Director.

### A

Under 34 C.F.R. § 417.20, an applicant is eligible to be designated the National Center if: (1) the application is from a nonprofit entity associated with a university and (2) is prepared to make a substantial financial contribution towards the establishment of the National Center. The eligibility criteria did not address whether an application needed to provide for a single director as required by 20 U.S.C. § 2404(a)(3). The Secretary dismissed the statutory criterion as a "minor technical issue" that would be resolved in the negotiation process.

■ The Secretary's attempt to explain away the unambiguous statutory requirement is woefully inadequate. An issue is deemed substantial when it is addressed in the context of a statute—there is nothing minor when an issue concerns the intent of Congress as expressed in a statute. The articulated purpose of the negotiation process is to clarify the provisional awardee's obligations under the grant. Congress, clearly set out the minimum eligibility re-

quirements in section (a) of the statute. The statutory language is clear, Congress specified that the National Center have "a Director." The Secretary was responsible for implementation of 20 U.S.C. § 2404 and should have required that the applications provide for a Director. The Secretary's failure to make initial eligibility contingent upon statutory compliance is not in accordance with 20 U.S.C. § 2404(a).

## B

Actually, the Berkeley application describes the Director position in terms of co-directors (Drs. Benson and Swanson) or co-principal investigators who, at the apex of the management hierarchy, are ultimately responsible for the entire Center. P.Ex. 14 at 40. Such an arrangement does not comply with 20 U.S.C. § 2404(a).

As the Court noted previously, the statute clearly requires a single Director. Such a construction does not allow for a co-directorship or any other similar arrangement. Apparently concerned with statutory compliance, the Secretary, during the negotiation prccess, asked Berkeley whether its National Center would have "one director." P.Ex. 15 at Management Q.1(a). In response, Berkeley stated that Dr. Benson would be the Director and Dr. Swanson would be an Associate Director. P.Ex. 16 at Management Q.1(a). The Secretary was satisfied with Berkeley's change of titles although it "did not change the substance at all." Tr. at 284. Dr. Benson testified that the change of title did not change his role in the National Center organization described in the application. Tr. 259. Dr. Swanson testified likewise. Tr. 310. This suggests to the Court that the change was merely to give the appearance of compliance when, in fact, there is in substance, two directors or co-directors of the project.

## II

■ The Berkeley application was submitted pursuant to 34 C.F.R. 75.128. That regulation generally permits a group or consortium of eligible parties to apply for a Department of Education grant by desig-

nating one member of the group as applicant and including the consortium agreement with its application. The Berkeley application stated that it was a proposal from The University of California at Berkeley, The University of Illinois, The University of Minnesota, The Rand Corporation, Teachers College of Columbia University, and Virginia Polytechnic Institute and State University.

After thorough examination, the Court notes that the multi-volume Berkeley application does not include any contracts between institutions. When the Secretary requested copies of the subcontracts, during the negotiation process, Berkeley declined to provide subcontracts on the grounds that it had a policy not to draw up subcontracts prior to an award. P.Ex. 16 at Management Q.6(a). However, Berkeley did provide a "model of a subcontractual agreement which typifies the format utilized by the University of California at Berkeley" during the negotiation process. *Id.* The Secretary's actions were not in accordance with 34 C.F.R. 75.128(G).

## A.

Ohio State argues that the consortium arrangement contemplated by Berkeley is inconsistent with the 20 U.S.C. § 2404(a), in that the statute requires "the" National Center.... to be associated with "a".... university. The plaintiffs contend that the Berkeley award violates that requirement by funding a group of six regional centers. The Secretary claims that the Berkeley application misused the term "consortium" because in reality the relationship between Berkeley and the five other institutions described by the substance of the application was a prime contractor-subcontractor relationship which is permitted by 20 U.S.C. § 2404(b).

Plaintiffs attribute to Congress an intent to limit the Secretary's discretion to only fund one National Center which has one location as opposed to a National Center which is in fact a series of regional centers. The National Center was originally created in 1976 by 20 U.S.C. § 2401, as enacted by Public Law 94–482. The reasons for the

action and the meaning of the exact text of the statute were explained when the statute was enacted:

> The term "center" implies centrality and concentration of resources. Inherent in the concept is the *critical mass* of resources and interdependent functions to cost effectively and adequately serve the impact on vocational education. Problems of planning, coordination, and essential functions such as dissemination and information services are confounded if divided among several "national" centers.

> During the House ... hearings on the vocational education bill, testimony was presented and discussed relating to the single versus multiple centers concept. This same issue of center versus centers was raised and debated and not brought to a vote because of the strong support in the subcommittee and committee. Considering all the testimony presented, as well as related information collected directly by the House subcommittee, *it was clearly substantiated that a single national center should be established* which is selected on a competitive basis with the ability to directly, or through contracts with other public agencies, work on the solving of vocational problems of national significance. *Each time the matter was discussed, the important need for providing a "critical mass" of resources in one center to provide national center functions as specified in the vocational education bill, was clearly established.* Based on first, this highly stressed need, second, the fact that the federal government has not been capable of adequately supporting even one national center since 1965, and third, the extensive support from the practitioners and leaders in the field of vocational education for the single national center concept, the Education and Labor Committee derived the language stated in the House Bill.

122 CONG. REC. 11, 13379–80 (May 11, 1976) (Remarks of Rep. Mottl) (Emphasis supplied).

The 1976 statute specifically permitted the Commissioner of Education to award the National Center to an agency with multiple "locations, including contracts with one or more regional research centers." 20 U.S.C. § 2401. That language was included to allow for regional research centers and other public agencies to be funded through the National Center. The Commissioner then used his discretion to fund a National Center in one location with no regional centers.

In 1984, the question of one National Center in one location rather than multiple locations was raised again. Congress resolved this question in favor of one National Center in one location. It deleted the provision for multiple locations and regional centers and presently permits a prime contractor-subcontractor relationship. Congress rejected Senate amendments to the Perkins Act that would have required that funding for vocational education research be divided among institutions, with no single institution receiving more than 20% of the available funding. H.R.Conf. Rep. No. 1129, 98th Cong., reprinted in 1984 U.S.Code Cong. and Admin.News 4134, 4154. Congress Committee observed that:

> The Committee wishes to call attention to the fact that this bill continues the mandate for *a national center* for research in vocational education, which under the current legislative authority has provided a significant improvement to the vocational education field.

H.R. No. 612, 98th Cong., reprinted in 1984 U.S.Code Cong. and Admin.News 4097, 4112 (Emphasis supplied).

■ The intention is clear from the legislative history of the statute—Congress unequivocally mandated that one National Center in one location must be funded. However, Berkeley's application described what the terms of the consortium relationship would be and stressed the novelty of the "new organizational structure for the National Center." The application stated:

> The conventional approach to a research center has been to locate all principle researchers in one place, creating a *critical mass* of individuals concentrating on

a common set of topics, often around one intellectual leader. For the proposed National Center, *however this model is unworkable.* We will replace the conception of the Center as a single institution, with personnel in one location, with a contractual relationship among six institutions ... (P.Ex., at 37) (Emphasis supplied).

It is conventional wisdom that the management of several institutions may be more complex than the management of a Center located at a single institution. We recognize this potential difficulty, but we also believe that ease of management ought to be subordinate to fulfilling the mission of the National Center. Once this mission has been defined, and *the necessity for a consortium of institutions established,* then the task remaining is to devise a management structure that will enable that mission to be fulfilled effectively as possible ... (Id., at 171) (Emphasis supplied).

Nevertheless, Berkeley insisted that the above described consortium arrangement was contractual in nature. Their application stated:

We are using the term "consortium" generically to describe our multi-institutional contractual arrangements. Berkeley is and will remain the central location for the Center and will have full and final responsibility for administering the Center's grant. (P.Ex. 14 at 170).

The Court disagrees, Berkeley's organizational model is clearly at odds with its disclaimer and with Congressional intent. In 1976 Congress determined that the efficiency and efficacy of the National Center required a "critical mass of resources" in one center. For the National Center, individuals comprise the prime resource for the purposes of vocational education research. Furthermore, in 1984, Congress rejected the idea that the mission of the National Center necessitated a consortium of institutions. Berkeley's application does not adhere to the clear intent of Congress. However, during the negotiation process, the Secretary instructed Berkeley to "delete all references to a consortium in order to reflect the fact that the grant will be support-

ing a national center and the five institutions with which it subcontracts." P.Ex. 15, at Management Q.5(b). Berkeley agreed to do so. P.Ex. 16 at Management Q.5(b). The Secretary's request is an admission which supports plaintiff's assertion that the Berkeley application was ineligible.

#### B.

■ Ohio State argues that Berkeley's financial contribution towards the establishment of the National Center is not substantial. The various contributions and concessions from each institution listed in the Berkeley application total $685,597. P.Ex. 14 at App.Vol.C, p. 17. Berkeley alone would contribute $93,241. *Id.*

20 U.S.C. § 2404 mandates that the university associated with the National Center is to provide a substantial financial contribution towards its establishment. An application must describe the financial contribution the university will make towards the establishment of the National Center. 34 C.F.R. 417.20. Neither the statute nor the regulations define what constitutes a substantial financial contribution. The Secretary viewed the assessment of financial contribution as an eligibility requirement. Dec. Bonnie Guiton, at Attachment A. p. 4.

The Secretary concluded during the negotiation process that a larger proportion of the Berkeley contribution had to come directly from Berkeley rather than simply flow through Berkeley from the other institutions. Tr. 281. As a result, Berkeley agreed to pledge a direct annual contribution in excess of $600,000. Tr. 237. These actions are admissions by the Secretary and Berkeley and support the conclusion that the Berkeley application was ineligible at the very threshold of this process.

#### C.

■ Ohio State contends that the Secretary's selection of the review panel violated 20 U.S.C. § 2404 in two respects. First, that the panel was not wholly comprised of individuals "recognized nationally as experts in vocational education administration and research." The plaintiff has pointed to

nothing in the express language or legislative history of the Perkins Act which could provide the Court with parameters or guidance by which the Court could determine whether the appointment of the panelists violated the statutory provision that they be "recognized nationally as experts in vocational education administration and research." The determination of who qualifies as "recognized nationally as experts in vocational education administration and research" is a classic example of a determination committed to the discretion of an agency that has special expertise necessary to make a qualified judgment. Such a determination is beyond the competence of this Court and is not subject to judicial review. This Court will not substitute its judgment for that of the Secretary.

Second, Ohio State argues that the Secretary violated minimal standards of fairness to the applicants when he allowed two persons to be selected as panelists that had previous contact with the existing National Center. 20 U.S.C. § 2404 requires a panel composed of individuals appointed by the Secretary who are not federal employees and who are recognized nationally as experts in vocational education administration and research. The panelists also had to be unbiased and not have any affiliations with the grant applicants. Dec. John Pucciano.

The Secretary conducted a regular, annual review of the performance of the National Center, in 1986. This was prior to funding the Center for 1987. The review was conducted by a panel of five persons which included Donald Roberts. Also in 1986, the Secretary announced the availability of planning grants to assist potential participants in preparation for the 1987 National Center competition. The Secretary appointed a panel of five persons to review the applications which included Phillip Atkinson. In 1987, these same individuals, Donald Roberts and Phillip Atkinson, along with three others, were appointed by the Secretary to review the applications for the National Center Competition.

██ It is obvious that the Secretary did not follow informal guidelines when he selected Drs. Roberts and Atkinson. It is equally apparent that the doctors had developed conclusions based upon their previous contacts with the existing National Center. The previous contact that the Doctors had with the applicants raises serious questions concerning their objectivity and open mindedness and gives, at the very least, an appearance of impropriety. Such action by the Secretary is an abuse of discretion.

### D.

Finally, Ohio State claims that the Secretary failed to have the panel review the amended Berkeley application. The Secretary contends that the action was harmless because none of the changes were significant under the seven criteria panelists applied. The Secretary's counsel clearly expressed the Secretary's view:

> [i]t was none of the site reviewer's business, quite frankly, your Honor, whether or not there was a substantial contribution, whether or not there were co-directors, whether or not there was one national center.

Tr. at 209.

██ 20 U.S.C. § 2404(a) mandates that the award of the National Center is to be based on application and requires the Secretary to act with the advice of a panel of nationally recognized experts in vocational education administration and research. It is obvious that the Secretary denied the panel an effective opportunity to review applications by permitting Berkeley to amend its application after panel review. Furthermore, the Secretary's position cannot withstand even cursory review of the criteria by which the panelists were to evaluate the applications. One of the most important criteria as "management", which accounted for 20% of the total score. In evaluating "management," the panelists were to examine:

(i) The applicant's philosophy of management for the National Center.

(ii) How the applicant will implement izing the National Center, particularly with regard to the public or private nonprofit university with which it is associated;

(iii) The applicant's plan for managing the National Center's activities and personnel, including quality control procedures for its activities and products and procedures for monitoring compliance with timeliness.

34 C.F.R. § 417.31(b).

Clearly, changes from a co-directorship to a single director and the governmental arrangements of a consortium versus that of a prime contractor-subcontractor relationship would have great significance under the management criterion. Moreover, it was under the management criterion that the scores varied most dramatically between the written applications and site reviews.

If the changes effected in Berkeley's amendment to its application during the negotiation process, did not change the substance of the application, then the statutory defects were never cured. If the changes were substantial enough to cure the defects, their effect on management and organization was so great as to require review by the panel.

## CONCLUSION

■ The Court notes that "[t]he interpretation of a statute by an agency charged with its enforcement is a substantial factor to be considered in construing the statute." *Youakim v. Miller*, 425 U.S. 231, 235–236, 96 S.Ct. 1399, 1402, 47 L.Ed. 2d 701 (1976), citing *New York Department of Social Services v. Dublino*, 413 U.S. 405, 421, 93 S.Ct. 2507, 2516, 37 L.Ed. 2d 688 (1973). However, in this case it appears that the Secretary substantially ignored applicable statutory and regulatory requirements. The Secretary's departure from the requirements is evident in relation to the negotiation process. The negotiation process permitted the Secretary to engage in result orientation, while paying lip service to statutory and regulatory guidelines. In light of the legislative history of the Act and the plain language of the statute, an "apply now-conform later" scheme is clearly not what Congress intended.

Such a scheme is not permitted under the applicable regulations. 34 C.F.R. § 75.109(b) allows an applicant to make changes to its application on or before the deadline date for submitting applications under the program. Under 34 C.F.R. § 75.216(a)(2)(3), the Secretary is supposed to return an application to an applicant if the applicant does not comply with all of the procedural rules that govern the submission of the application or if the application does not contain the information required under the program. The undisputed facts show that Berkeley did not amend its application on or before the deadline of August 14, 1987, in regard to the necessity for: (A) copies of sub-contracts; (B) a single Director; (C) a substantial financial contribution; and (D) a single National Center. The facts also show that the Secretary did not return Berkeley's non-conforming application. This defect was not cured by the negotiation process—applicants may not apply now and conform to statutory or regulatory requirements after the deadline date. The Secretary's failure to return Berkeley's application is contrary to the provisions of 35 C.F.R. 75.216.

■ The factors to be considered in determining whether a motion for preliminary injunction should be granted are well established. They are: (1) whether the plaintiff has shown a strong or substantial likelihood or probability of success on the merits; (2) whether the plaintiff has shown irreparable injury; (3) whether the issuance of a preliminary injunction would cause substantial harm to others; and, (4) whether the public interest would be served by issuing a preliminary injunction. *Mason County Medical Association v. Knebel*, 563 F.2d 256, 261 (CA6 1977).

After reviewing all of the relevant documents and listening to testimony, the Court is satisfied as indicated by the above discussion that the plaintiff's case is clearly meritorious. The plaintiff also showed that it would suffer irreparable harm if the Secretary is permitted to award the grant to Berkeley. The loss of a 30 million dollar grant is certainly substantial and irreparably harmful. The Court is satisfied that the potential harm caused to others by issuing an injunction is far outweighed by

the public need for a National Vocational Education Center established and operated in accordance with the law as specifically intended by Congress. In light of the public interest in seeing government officials comply with the law and the intent of Congress in the establishment of the National Vocational Center, the Court finds that the public interest will be served if the Secretary is enjoined from awarding the grant to Berkeley.

THEREFORE, it is ORDERED, ADJUDGED AND DECREED:

1. That the Secretary vacate the designation of the University of California at Berkeley as the National Center for Research in Vocational Education.

2. That the Secretary return the application submitted by the University of California at Berkeley as ineligible.

3. That the Secretary begin anew the award process in strict compliance with 20 U.S.C. § 2404 and applicable regulations.

4. That the new award process shall be consistent with this opinion.